## MANUEL B. HART *et al.*

### *v.*

## THOMAS H. SEYMOUR *et al.*

*Filed at Ottawa October 26, 1893.*

1. TRUSTS AND TRUSTEES—*deed construed—whether it creates a trust.* A deed which runs to A, B and C, "trustees of" a land and building association, an unincorporated company, and "to their heirs and assigns forever," is of itself no declaration of trust in A, B and C, but, *prima facie,* conveys an absolute title to the grantees therein named. The words "trustees of," etc., in the absence of proof of the existence of a legally organized corporation or a company of that name, will be regarded for all purposes, except as a *descriptio personarum* of the grantees, as mere surplusage.

2. SAME—*deed to the trustees of a co-partnership—whether it is void.* Where the trustees of a co-partnership, composed of three, and other natural persons, take a sheriff's deed for land in trust for the firm in collecting a judgment owned by the firm, the deed will not be void for the want of capacity of the beneficiaries, even if the trust thereby created is such as to be executed by the Statute of Uses. In such case, the partners are capable of becoming such beneficiaries.

3. SAME—*application of the Statute of Uses.* Where, by the terms of the trust, the property of an association is vested in trustees for management and disposition, and is to be held by them as individuals, and they are to have the lands purchased, surveyed, divided and platted, and they are empowered to improve and decorate the same, in their discretion, and it is made their duty to manage, protect, control, use, lease, sell, convey and dispose of, mortgage and incumber, the lands of the association, on such terms and for such considerations as they may, from time to time, deem for the best interests of the association, the exercise of such powers and the performance of such duties will make it necessary that the trustees shall be vested with the legal title, and the Statute of Uses will have no application.

4. If any agency, duty or power be imposed on a trustee, as, by a limitation to him and his heirs to pay rents or to convey the estate, or if any control is to be exercised or duty performed by the trustee, or applying the rents to the persons' maintenance, as, in making repairs or to preserve a contingent remainder, or to raise a sum of money, or to dispose of the estate by sale,—in all these and in like cases the operation of the Statute of Uses is excluded, and the trusts or uses remain mere equitable estates.

5. SAME—*effect of the power of removal of trustees.* The fact that by the trust agreement the shareholders are empowered to remove a trustee, and in case of a vacancy caused by such removal, or by death, resignation or otherwise, to appoint a successor in trust, or that a majority in interest are empowered, at a regular meeting, to direct and control the action of the trustees, will not change the rule, when no attempt has been made to exercise such reserved powers. So long as the trustees remain vested with powers and charged with duties making it necessary for them to have the legal title, the statute can not apply, and they can not be divested of such title by the mere existence of the power, on the part of the shareholders, to remove them or to control their action.

6. SAME—*creation of a trust—its effect on the power of alienation.* The mere creation of a trust does not, *ipso facto,* suspend the power of alienation. That power is only suspended by such trust when a trust-term is created, either expressly or by implication, during the existence of which a sale by the trustee would be in contravention of the trust. When the trustee is empowered to sell the land without restriction as to time, the power of alienation is not suspended, although the alienation is in fact postponed by the non-action of the trustee, or in consequence of a discretion reposed in him by the creator of the trust.

7. SAME—*agreement as to land—recording.* Where several persons enter into a written agreement to engage in the business of buying, improving and selling suburban property, and appoint three of their number as trustees, to take and to hold the title to the lands purchased, and to control, improve, subdivide and sell the same, and to have general control of the affairs of the association, and in pursuance of such agreement purchase other land, taking the legal title to such trustees, the equitable rights of the several parties will be determined by the provisions of the agreement, and by that alone, whether such agreement is entitled to record or not.

8. PERPETUITY—*what constitutes.* A perpetuity is a limitation of property which makes it inalienable beyond a life or lives in being and twenty-one years more, with a fraction of a year added for the term of gestation, in cases of posthumous birth.

9. Where land is to be conveyed to trustees, to be subdivided and improved, and then sold, and the time of sale is left wholly to their discretion, and no trust-term is created, and a conveyance of the land, or any part of it, is no violation of the trust, there will be no perpetuity. Where there are persons in being at the creation of an estate, capable of conveying an immediate and absolute estate in fee in possession, there is no suspension of the power of alienation.

10. FRAUD—*creditor pursuing a legal remedy.* After the maturity of a debt secured by deed of trust, the debtor offered to give the creditor

certain unincumbered lots, and furnished the latter an abstract of the title to the lots, under the belief that such lots would be taken in satisfaction of the debt. The creditor, instead of taking the lots, attached the same and other lots, and obtained a sheriff's deed : *Held,* that the creditor was not chargeable with fraud and imposition in pursuing a remedy given him by law, and that the sale could not be set aside, in equity, on the ground of fraud.

11. REDEMPTION—*extension of time—effect of indefinite propositions.* Where a creditor gives assurances to the debtor that an extension of the right to redeem from a sale under an attachment will be given, but no definite time in which to redeem is fixed, and the evidence fails to show that the assurances thus given were ever relied on by the debtor, or that he was thereby induced to alter his position so as to call into operation the doctrine of estoppel, there will be no valid contract for the extension of the time of redemption which can be enforced.

12. CONTINUANCE—*avoiding, by admissions as to testimony—in chancery.* Where a party, for the purpose of avoiding a continuance in a chancery suit, admits that the absent party, as a witness, if present, would testify as stated in the affidavit, the other party will be entitled to have the absent party's testimony received and weighed precisely as though he had appeared as a witness and had sworn to the facts stated in the affidavit.

13. MERGER—*in judgment—opening second judgment thereon.* By the recovery of a judgment *in personam* upon promissory notes they will become merged in the judgment, and no action can be maintained on them thereafter; and if a judgment *in rem* is afterward obtained on the notes, and property attached is levied on and sold, the second judgment may be opened up, and the debtor's heirs be allowed to pay the sum due, and redeem from the sale.

APPEAL from the Superior Court of Cook county ; the Hon. KIRK HAWES, Judge, presiding.

Mr. WALLACE HICKMAN, and Mr. JAMES G. ELSDON, for the appellants :

When an estate is conveyed to one person for the use of or upon trust for another, and nothing more is said, the Statute of Uses immediately transfers the legal estate to the usee, and no trust is created, though express words of trust are used. Perry on Trusts, sec. 298 ; *Witham* v. *Brooner,* 63 Ill. 344 ; *Lynch* v. *Swayne,* 83 id. 336 ; *Kirkland* v. *Cox,* 94 id.

400; *O'Melia* v. *Mullarky*, 124 id. 507; *Meacham* v. *Steele,* 93 id. 135; *Roth* v. *Michalis,* 125 id. 325.

That trusts and legal estates are governed by the same rules, is a maxim which has obtained universally. 2 Washburn on Real Prop. 530; 2 Spencer's Eq. Jur. 875; 2 Flint on Real Prop. 631; Sand. on Uses, 269.

The Norwood Land and Building Association was not a corporation. It was incapable of taking title to real estate. 3 Washburn on Real Prop. 280.

A grant to a corporation which has never been created is void for want of a grantee. 3 Washburn on Real Prop. 281; *Turnpike Co.* v. *Ward,* 13 Ohio, 120; *German Land Ass.* v. *Scholler,* 10 Minn. 331; Smith on Real Prop. 482; 2 Preston's Stat. Touch. 237.

A deed to W. H. Phelps & Co., which was a partnership firm composed of Phelps and two others, was held to pass no title. *Arthur* v. *Weston,* 22 Mo. 379.

So it was held that a deed to a pretended corporation, which had no real existence, was absolutely void. *Douthitt* v. *Stinson,* 63 Mo. 268.

A deed to the directors of a corporation which was named therein, which then had no existence but was subsequently organized, was held to pass no title to the corporation.

If the *cestui que trust* be not named, or is uncertain, the conveyance will be wholly void. 2 Washburn on Real Prop. 530; *Hotchkiss* v. *Elting,* 36 Barb. 44.

It can not be contended that the trustees took title individually, for when property is conveyed to a grantee merely as a trustee for others, he will take no legal title or beneficial interest under such deed. 2 Washburn on Real Prop. 530; Lalor on Real. Prop. 157.

Declarations of trust are construed like deeds of real estate. (2 Washburn on Real Prop. 460.) And even a letter has been held a sufficient declaration of trust. *Rankin* v. *Barcroft,* 114 Ill. 441; *Kingsbury* v. *Buckner,* 70 id. 514, and 58 id. 310.

The association and appellees, by this continuance and device of a perpetual trust, endeavored to hold land in perpetuity and for indefinite accumulation, contrary to law. All conveyances attempted to be so made are void. *Waldo* v. *Cummings,* 45 Ill. 426; *Rhoads* v. *Rhoads,* 43 id. 239.

Estates might thus be held in suspension *ad infinitum* in the hands of a succession of trustees, "in direct contravention of the statutes against perpetuities." *Bascom* v. *Albertson,* 34 N. Y. 596; *Phelps* v. *Pond,* 23 id. 77.

A perpetuity will not be tolerated when it is covered by a trust, more than when it displays itself undisguised, in the settlement of a legal estate. 1 Perry on Trusts, 377, 379, 382.

Therefore, the creation of a trust, or an equitable interest, which may not vest in the object of the trust within the time limited by law for the vesting of legal estates, will be nugatory. Perry on Trusts, 383; *Bailey* v. *Bailey,* 28 Hun, 603; *Attorney General* v. *Greenhill,* 9 Jur. (N. S.) 1307.

If a trust for accumulation may possibly exceed this limit, (lives in being and twenty-one years,) it is wholly void, and it can not be cut down to the legal limit. The property falls back to the original holder. Perry on Trusts, 393, 66, 394; *Taylor* v. *Keep,* 2 Bradw. 368.

The law concerns itself with the possibilities of accumulation, and not with the fact. Perry on Trusts, 396.

It is a fundamental proposition that equitable estates are governed by the same rule as legal estates. Perry on Trusts, 357.

The association and the trustees have so conducted themselves that they stand in a trust relation toward the complainants.

Where a person obtains title to property under such circumstances that he ought not, according to the rules of equity and good conscience, as administered in chancery, to hold and enjoy the beneficial interests of property, courts of equity

will raise a trust, by construction, out of such circumstances, and this trust will fasten upon the conscience of the offending party. *Freer* v. *Lake*, 115 Ill. 667; *Allen* v. *Jackson*, 122 id. 567; *Ventres* v. *Cobb*, 105 id. 33; *Aulger* v. *Clay*, 109 id. 487.

Messrs. CUTTING & CASTLE, for the appellees:

The words "trustees of the Norwood Land and Building Association," in the deed, are merely *descriptio personarum. Tower* v. *Hale*, 46 Barb. 36.

A grant to the trustees of an unincorporated association gives the estate to the trustees in their individual right. *Tower* v. *Hale, supra; Austin* v. *Shaw*, 10 Allen, 552; *Dee* v. *Hay,* 21 N. J. L. 174; *Ryan* v. *Richford*, 140 Miss. 31.

If there is a trust it is not a vested one, within the Statute of Uses.

As to whether a perpetuity was attempted to be made, see *Barnes* v. *Suddard*, 117 Ill. 237; *Alexander* v. *Tolleston Club*, 110 id. 72; *Robert* v. *Coming*, 89 N. Y. 225; *Everett* v. *Everett*, 29 id. 39; Gray on Perpetuities, secs. 203, 443; *Waldo* v. *Cummings*, 45 Ill. 421.

Mr. JUSTICE BAILEY delivered the opinion of the Court:

This was a bill in chancery, brought by Manuel B. Hart and Love Mary Vaughan, grandchildren and only heirs at law of Mary A. Bishop, deceased, against Thomas H. Seymour and numerous other parties, to redeem certain lands from sale on execution in certain attachment proceedings prosecuted against Mary A. Bishop, in her lifetime. It appears that about July 20, 1871, Mrs. Bishop purchased of James E. Tyler, George Field and John F. Eberhardt, trustees of the Norwood Land and Building Association, block 62, in Norwood Park, and that to secure a part of the purchase money, she executed her three promissory notes, for $1050 each, bearing date July 20, 1871, payable to James E. Tyler, trustee, in one, two and three years from their date, with in-

terest at the rate of eight per cent per annum, and that to secure the notes, she at the same time executed a deed of trust conveying the property purchased, to Charles H. Field, trustee. The deed of trust has never been foreclosed, nor has any attempt ever been made to execute the power of sale therein contained.

About May 22, 1876, the last two notes, viz., those maturing two and three years after date, being still unpaid, Tyler, the payee, commenced a suit in attachment against Mrs. Bishop to recover the amount of those notes she then having removed to the State of Massachusetts and being a non-resident of this State, and levied his attachment writ on thirty-four lots in Orvis' Subdivision, etc., belonging to Mrs. Bishop, and which were then unincumbered, except perhaps by unpaid taxes and tax sales. In that suit, Mrs. Bishop's appearance was entered by her attorney, and a personal judgment was thereupon recovered against her for $2788.80, the amount of the two notes and costs. On that judgment execution was afterward issued and levied on the lots in Orvis' Subdivision, and those lots were sold at execution sale for $2200, Tyler, the judgment creditor, becoming the purchaser. After deducting the costs and expenses, the judgment was satisfied by the sale to the amount of $2158. Of this sum, Tyler afterwards endorsed $1476.67 on the note maturing July 20, 1873, and the sum of $681.33 on the note maturing July 20, 1874. The certificate of sale was issued to James E. Tyler, trustee of the Norwood Land and Building Association, and was afterwards assigned to Tyler, Field and Eberhardt, trustees of that association. On December 6, 1881, a sheriff's deed was executed in pursuance of the sale to Tyler, Field and Eberhardt, trustees of the association.

Again, in the early part of the year 1882, Tyler, trustee, etc., commenced a second attachment suit in the Superior Court of Cook county against Mrs. Bishop, and levied his attachment writ on block 62, in Norwood Park. In that suit he

declared upon the two promissory notes, and appended to his declaration an affidavit that his claim was for the balance due on those notes, the amount claimed being $1470. In that suit there was no personal service on Mrs. Bishop, and no appearance by her, the only service upon her being by publication, and on or about June 7, 1882, a judgment was entered in the cause for $1470 and costs. On that judgment a special execution was issued for the sale of the property attached, and under that execution, block 62 was sold September 18, 1882, for $1542.08, James E. Tyler, trustee, etc., becoming the purchaser. The certificate of sale having been assigned to Tyler, Field and Eberhardt, trustees of the association, a sheriff's deed was executed to them bearing date January 25, 1884.

The bill claims the right, upon various grounds which will be discussed presently, to redeem from both of these sales. The court by its decree denied the right to redeem from the sale of the lots in Orvis' Subdivision under the execution in the first attachment suit, and from that portion of the decree the complainants have appealed to this court. That portion of the prayer of the bill by which the complainants ask to be allowed to redeem from the sale of block 62, under the execution in the second attachment proceeding, was granted, and as to that portion of the decree, the defendants have assigned cross errors.

The Norwood Land and Building Association is an unincorporated joint stock association, composed of some twenty eight individuals, and the form of their organization, the nature of their business enterprise, and their respective rights, duties and obligations, were evidenced by a trust agreement, signed and acknowledged by each of the associates, and bearing date June 1, 1868. That agreement was between the several associates, of the first part, and James E. Tyler, George Field and John F. Eberhardt, of the second part, as trustees, and after reciting that the associates had purchased,

and were contemplating the further purchase of certain lands particularly described, a portion of the purchase money for which had been paid and a portion was yet to be paid, and that a purchase of some of the lands had been made in the names of certain of the associates for the benefit of all, with the understanding that all the property purchased should, for management and disposition, be vested in the trustees named, for the benefit of all the parties in interest and their assigns, and that the parties of the second part had agreed to take and execute such trust upon the terms and conditions thereinafter stated, it was agreed that the following articles be adopted as the agreement between the parties:

Article 1 fixed the name of the association as above stated, and declared its objects to be, the management, improvement, development, lease, sale or other disposition of the lands acquired for the benefit of the association. Article 2 provided that the officers of the association should be a president and secretary, and fixed their mode of election and term of office, and the times for holding the meetings of the association. Article 3 was as follows:

"James E. Tyler, John F. Eberhardt and George Field are hereby created trustees, for the purpose of carrying into effect these articles, and the title of all property owned or held for the benefit of this association shall be held by the trustees of this association, in their individual names, in fee simple, as joint tenants and not as tenants in common, to them and their assigns, and to the survivors and survivor of them, and to his heirs, assigns and successors."

Article 4 fixed the amount of the capital stock at $100,000, to be divided into 1000 shares of $100 each, that being the estimated cost of the lands owned and to be owned by the association. Section 5 provided that each shareholder and his assigns should pay to the trustees' his due proportion of the payments made and agreed to be made in the purchase of lands, and all expenses incurred on their account, when

called for by the trustees, the aggregate of the payments not to exceed the stock subscribed, and it was made the duty of the trustees to see that payments for purchases were duly and promptly made out of the funds thus provided. Article 6 made it the duty of the trustees, from time to time, to fix and assess the *pro rata* amount to be paid by each shareholder on account of·purchase money, interest and expenses, and call the amount by letter mailed to each stockholder thirty days before the time fixed for payment, and it was agreed on the part of the stockholders and their assigns, to make payment at the time and in the manner required by the calls, and provision was made, in case of non-payment, to forfeit and sell the shares of delinquents.

Article 7 provided that any property thereafter purchased by the trustees should be conveyed to them, for the same uses and purposes and upon the same conditions in the agreement provided, and should be paid for in the same manner as the balance of the purchases already made, the aggregate of all property purchased not to exceed the capital of the association. By article 8 the trustees were authorized to cause the lands purchased and to be purchased to be carefully surveyed, and to have proper maps, plats and diagrams thereof made, and·to cause the land to be laid out into lots, blocks, streets and alleys, and also into public squares and grounds, if they should think proper, in such manner as in their judgment would secure the greatest advantage and benefit from the property, and cause maps and plats of the subdivisions to be filed and recorded according to law, with full power and authority to vacate, change or alter the subdivisions in whole or in part, in their discretion, for the benefit of the association ; and the trustees were authorized to open, grade and plank or otherwise pave, the streets and alleys, as they might think proper, and to construct such bridges as they should deem desirable and advantageous, and to make any and all other improvements on the land which they should deem calculated to de-

velop, adorn and enhance the value thereof, and to employ the necessary agents, superintendents and workmen to take charge of and execute the same, and generally to do all other acts and things relating to the property, business and interests, by them deemed needful and proper, in order to carry fully and favorably into effect the purposes and objects of the association.

By article 9, they were given power and it was made their duty to manage, protect, control, improve, use, lease, sell, convey and dispose of, mortgage or otherwise encumber, any and all the lands, lots, property, assets and effects of the association, and of the parties in interest therein, and then held or which might thereafter be held by or intrusted to them, either for cash or on credit, or partly for cash and partly on credit, or for other property or things, or in part or in whole in exchange, and on such terms and for such considerations as they shall from time to time deem best for the interests of the association. And they were authorized and empowered to make all necessary contracts, leases and agreements in connection with the care and management of the same, and also all conveyances for the sale and disposition of the whole or any part thereof, and to pay and discharge all expenses, costs, charges, taxes, liens, incumbrances or other liabilities pertaining to or properly or legally charged upon or existing against the property and effects or connected with or growing out of the care, management, improvement, use, lease or sale of the same or otherwise. And it was provided that, for the time being, the trustees should take and receive in their names individually, all money, notes, contracts, agreements, bonds, mortgages or other instruments in writing arising or resulting from sales of said property or otherwise, or in connection therewith in any way, and that they might make any exchange or compromise of any securities, and have power and authority to satisfy, discharge and cancel the same, or any part thereof.

The instrument contains several other articles, quite voluminous in their provisions, prescribing the mode in which the

trustees should perform the duties of their trust, providing for their compensation, giving two-thirds of the shareholders in interest power to remove any trustee and to fill vacancies however caused, and giving them power, at any general meeting, to give directions concerning the capital and property of the association, and the management and disposition thereof, provided such directions were consistent with the terms of the trust agreement, and were assented to by a majority in interest of all the shareholders.

The first proposition submitted by counsel for the complainant is, that the title of Mary A. Bishop was not divested by the sheriff's deeds to Tyler, Field and Eberhardt. The argument upon which this contention is based, if we understand it correctly, is this: that the trust agreement, of which we have given the substance, although in fact recorded in the office of the recorder, was not an instrument entitled to be recorded, and did not operate to affect the title to the land in controversy; that in determining the validity of the title conveyed, only the deeds themselves are to be considered, and that the trust declared in the deeds is one which is executed by the Statute of Uses; but as the usee is an unincorporated association, and incapable, as an association, of taking and holding title to lands, the trust for that reason can not be executed, and the deeds themselves must be held to be void. That this reasoning is unsound will appear from a variety of considerations.

In the first place, if the question of title is to be determined solely from what appears upon the face of the deeds, it is not sufficiently shown that any trust whatever is declared, and much less that the trust is one which the Statute of Uses will execute. The deeds both run to Tyler, Field and Eberhardt, "trustees of the Norwood Land and Building Association," and "to their heirs and assigns forever." This was of itself no declaration of trust, but, *prima facie,* conveyed an absolute title to the grantees named.

39—147 ILL.

The case of *Towar* v. *Hale*, 46 Barb. 361, involved a conveyance of substantially the same character as these. There the deed was executed to three persons named, "trustees of the Methodist Society, and their successors, of the town of Lyons," etc., and the grant was to the parties of the second part, "and their heirs and assigns forever," and it was held that the deed conveyed the absolute title to the three individuals named therein as grantees, and that the addition to the names of the words, "trustees of the Methodist society, and their successors," etc., in the absence of proof of the existence of a legally organized society of that name, should be regarded, for all purposes except as a *descriptio personarum* of the grantees, as mere surplusage.

In *Den* v. *Hay*, 21 N. J. L. 174, a conveyance was made to three individuals named, "trustees of the Associated Presbyterian Congregation of Newark," and it was held that, by such deed, the title to the premises conveyed was vested in the trustees individually, and not in the corporation, and that their designation as trustees of the congregation was a mere *descriptio personarum.* See also *Austin* v. *Shaw,* 10 Allen, 552.

But we are not prepared to hold that there is any such incapacity in the beneficiary or beneficiaries named in the deeds as would render the conveyance void, even if such trust had been thereby created or declared as would have been executed by the Statute of Uses. The association not being incorporated, was, in contemplation of law, a mere copartnership, composed of the several associates who executed and thereby became parties to the trust agreement, and the name adopted by the agreement may be regarded as their firm or copartnership name. The copartners were all natural persons, whose identity was fixed and ascertained by the agreement itself. The grantees in the deeds, therefore, if they took the land in trust, took it in trust for their firm, composed of ascertained partners, all capable of becoming beneficiaries of the trust. The case then is not one where deeds creating trusts may be

held to be void by reason of the incapacity of the beneficiaries to take and hold the title.

But we are not prepared to yield our assent to the view that, in determining the equitable rights of the parties, the trust agreement is not to be taken into account. By that agreement the association embarked in the business of buying, improving, subdividing, developing and selling suburban property in or near the city of Chicago, and with a view of having that business carried on with greater efficiency and convenience, three of their number were appointed trustees, to take and hold the title to the lands purchased, control, improve, subdivide and sell the same, and to have general control of the affairs and business of the association. There can be no question that the land in controversy was bought in at the sheriff's sale, and afterwards conveyed by the sheriff to the three trustees, in pursuance of the terms of the agreement. It follows necessarily, that the equitable rights of the parties to the land must be determined by the provisions of the agreement. The nature of the trust in accordance with which the trustees took title, is to be determined by the trust agreement, and by that alone.

There can be no doubt that the trust thus created was an active one, and one which involved the exercise of powers and the performance of duties which rendered it necessary that the trustees should hold the legal title, in order to the performance of such duties and the execution of such powers. That being the case, the statute of uses has no application. This court, in *Kirkland* v. *Cox*, 94 Ill. 400, adopting the statement of the rule as laid down in Perry on Trusts, said: "If any agency, duty or power be imposed on a trustee, as by a limitation to a trustee and his heirs to pay rents, or to convey the estate, or if any control is to be exercised or duty performed by the trustee in applying the rents to the person's maintenance, or in making repairs, or to preserve a contingent remainder, or to raise a sum of money, or to dispose of

the estate by sale, in all these and in other and like cases, the operation of the statute is excluded, and the trusts or uses remain mere equitable estates."

Here, by the terms of the trust, the property of the association was vested in the trustees for management and disposition, and was to be held by them as individuals, and they were required to have the lands purchased surveyed, subdivided and platted into blocks, lots, streets and alleys, and if they should think proper, into public squares and grounds, with full power to vacate, change and alter subdivisions, and to open, grade and pave streets, construct bridges, and make any other improvements by them deemed necessary to develop, adorn and enhance the value of the land, and to do all other acts and things relating to the property, by them deemed needful and proper to carry into effect the purposes and objects of the association, and they were given the power and it was made their duty to manage, protect, control, improve, use, lease, sell, convey, and dispose of, mortgage and incumber, the lands and property of the association, on such terms and for such considerations, as they should from time to time deem for the best interests of the association. It needs no argument to show that the exercise of these powers and the performance of these duties made it absolutely necessary that the trustees should be vested with the legal title, and, consequently, that the Statute of Uses can have no application.

Nor are we able to see that the conclusion here stated can be materially affected by the fact that, by the trust agreement, the shareholders were empowered to remove a trustee, and, in case of a vacancy caused by such removal, or by death, resignation or otherwise, to appoint a successor in trust, or that a majority in interest were empowered, at a regular meeting, to direct or control the action of the trustees. It is not pretended that, at the time of the execution of the sheriff's deeds, the power of removal had been exercised or attempted to be exercised, or that the shareholders had attempted to interfere

with the trustees in the execution of their trust. It is impossible to hold that the mere existence of these reserved powers, without being called into exercise, could have the effect of divesting the trustees of the legal title. So long as the trustees remained vested with powers and charged with duties which made it necessary for them to have the legal title, the statute could not apply, and they could not be divested of such title by the mere existence of the power on the part of the shareholders to remove them or to control their action.

It is next contended that the conveyances by the sheriff's deeds are void and therefore not having the effect of divesting Mrs. Bishop's title, because, as is claimed, the arrangement between the Norwood Land and Building Association and its trustees was a device for the creation of a perpetual trust, and consequently that it, and all conveyances attempted to be made in pursuance of it, are void, as being in contravention of the rule against perpetuities. It may be remarked that if this contention were allowed, it would have the effect of at once destroying Mrs. Bishop's title to block 62, as that was obtained by conveyance from the trustees under this identical arrangement. But we are unable to see how the trust agreement, and the various conveyances made in pursuance of it, can be said to have any tendency to create what the law denominates perpetuities.

A perpetuity, as defined by Anderson, is a limitation of property which renders it inalienable beyond a life or lives in being and twenty-one years more with a fraction of a year added for the term of gestation in cases of posthumous birth. Anderson's Law Dict. 770. In *Waldo* v. *Cummings*, 45 Ill. 421, are collected and cited with approval a number of similar definitions formulated by other standard law writers. It is there said: "A perpetuity is defined to be a limitation, taking the subject thereof out of commerce for a longer period of time than a life or lives in being and twenty-one years beyond, and in case of a posthumous child, a few months more,

allowing for the time of gestation. Bouvier's Law Dictionary. Gilbert, in his treatise on uses, defines it to be such a limitation of property as renders it inalienable beyond the period allowed by law. Gilbt. Uses, by Sugd. 260 and note. Lewis, in his treatise on perpetuities, defines it to be 'a future limitation, whether executory or by way of remainder, and of either real or personal property, which is not to vest until after the expiration of, or will not necessarily vest within, the period fixed and prescribed by law for the creation of future estates and interests, and which is not destructible by the persons for the time being entitled to the property, subject to future limitation, except with the concurrence of the individual interested under that limitation.' "

"The mere creation of a trust does not, *ipso facto*, suspend the power of alienation. It is only suspended by such trust, where a trust-term is created, either expressly or by implication, during the existence of which a sale by the trustee would be in contravention of the trust. Where the trustee is empowered to sell the land without restriction as to time, the power of alienation is not suspended, although the alienation is in fact postponed by the non-action of the trustee, or in consequence of a discretion reposed in him by the creator of the trust." *Robert* v. *Corning,* 89 N. Y. 225. See also, *Everitt* v. *Everitt,* 29 N. Y. 39; *Ferrand* v. *Wilson,* 4 Hare, 344; Gray on Perpetuities, 344-374.

It will be readily seen from these definitions, that there is nothing in the trust agreement in this case having the slightest tendency to create a perpetuity. The land was to be conveyed to the trustees to be subdivided and improved and then sold, and the time of sale was left wholly to their discretion. Indeed the whole scheme of the association was, to purchase, subdivide and improve suburban property for the purpose of placing it at once upon the market for sale. No trust-term was created, and a conveyance of the land or any part of it at any time was no violation of the trust. Where there are

persons in being at the creation of an estate, capable of conveying an immediate and absolute estate in fee in possession, there is no suspension of the power of alienation, and no question as to perpetuities can arise.

Finally, it is contended that the association and its trustees, by their conduct, have placed themselves in a trust relation toward the complainants, and the claim seems to be, that in view of that relation, the complainants should be permitted to redeem from the execution sales. It seems that in September, 1875, the last two of the notes given for the purchase money of block 62 being due and unpaid, Mrs. Bishop had an interview with J. H. Wrenn, the secretary and treasurer of the association, in which she offered to convey to the association twelve of her lots in Orvis' addition in payment and satisfaction of the notes. According to the version of this interview given by the complainant's witness, Wrenn expressed himself as satisfied with the offer, and said that if the trustees agreed to it, which he thought they would do, he would send for her abstracts, and the same witness testifies that a short time afterwards, Wrenn sent for and received the abstracts. Nothing further was done for several months, and Mrs. Bishop, as is claimed, went back to Massachusetts, supposing that the arrangement she had proposed would be consummated. Without further notice to her, the first attachment suit was commenced, in which all the lots in Orvis' addition owned by her were attached. It is contended that the association and its trustees, after getting possession of the abstracts in this manner, and ascertaining therefrom the fact of Mrs. Bishop's ownership of the Orvis' subdivision lots and their description, were guilty of an act of bad faith in availing themselves of the information thus acquired, by commencing their attachment suit and levying their attachment writ on these lots.

It may be noticed that Wrenn, in his testimony, denies that possession of the abstracts was obtained for the purpose of getting a description of the lots with a view to levying an

attachment thereon, or that the trustees first obtained their information that Mrs. Bishop was the owner of the lots and their description from the abstracts. But however that may be, we are unable to see that any legal fraud or imposition was practiced on Mrs. Bishop, even if it be admitted that the information derived from the abstracts was made use of in levying the attachment writs. It is not disputed that she went to Wrenn and voluntarily disclosed to him the fact that she was the owner of the lots in Orvis' subdivision, and her title being of record, the trustees were thus put ih possession of all facts necessary to enable them to levy their attachment writ. Possibly it was a little more convenient for them to get the precise description of the lots from the abstracts than to go and search for them in the recorder's office, but the disclosure made by Mrs. Bishop to Wrenn was sufficient to direct the attention of the trustees to the lots, and their subsequent levy of their attachment writ, was only the enforcement of a remedy for the collection of their debt which the law gave them. Whether or not it was a discourtesy to Mrs. Bishop or her legal advisor, after obtaining possession of the abstracts for the apparent purpose of determining whether to accept Mrs. Bishop's offer to convey twelve lots in satisfaction of the notes, to commence the attachment suit, without first apprising them of their rejection of the offer, or of their intention to enforce collection by suit, is a matter upon which we have no occasion to express an opinion. The courts have no jurisdiction to determine questions of that character. So long as the trustees commenced the attachment suit only by way of enforcing a remedy which the law clearly gave them, their conduct in the premises, so far as we are able to see, is subject to no legal criticism.

But evidence was introduced on behalf of the complainants and is now relied upon, tending to show that various assurances were given by Wrenn to Mrs. Bishop's attorney, after the attachment of the lots in Orvis' subdivision and before

the sale, and by Eberhardt, one of the trustees since that time, in substance, that the object of the trustees in attaching and selling the lots was, to increase their security, and that Mrs. Bishop might at any time, on paying the debt, get her property back. On this point, the attorney testified that he saw Wrenn, after the attachment suit was commenced, and charged him with bad faith in getting the abstracts on pretense of making the proposed trade, and then using the information thus obtained for the purposes of starting a different proceeding, which would tie up all of Mrs. Bishop's property that was not already tied up by the incumbrance; that Wrenn then explained to him that at first the trustees were disposed to make the trade, but afterwards concluded not to do so, preferring additional security for their money, but assured the witness that all they cared for was to hold the security, and that at any time the debt could be paid; that they did not want either piece of property; that they merely wanted their money secured; that whenever Mrs. Bishop could make a sale or raise the money to pay the indebtedness, she could have her property back, as they did not want it.

He also testified that he then had an interview with Mr. Eberhardt, who expressed regret that the trustees had taken that course, but said that he was not the managing trustee; that the matter had been left in Mr. Tyler's hands, and that it was on his order that the proceeding had been taken; that Eberhardt expressed himself as in deep sympathy with Mrs. Bishop, and anxious that something should be done to relieve her, but that he had to leave it to Mr. Tyler to manage as he thought best, but that he could assure the witness that all the company wanted was their money at any time, and that upon raising the money at any time to pay the debt, the property should be released.

The witness further testified that he met Eberhardt frequently after that, and that at almost every time they met, something was said about the difficulty Mrs. Bishop was in,

and Eberhardt asked the witness whether she was likely to work out of it. The witness testified to conversations with Eberhardt which he fixes in the years 1882, 1884, 1885 and 1886, in most of which Eberhardt reassured the witness that if Mrs. Bishop ever got so she could pay the debt, she could have the property.

On the other hand, Wrenn testifies positively that he never agreed to any redemption; that he possibly said to the attorney that if they wanted to settle up, the trustees of the company would only be too glad to get the money; that he never gave any positive indefinite extension of the right of redemption; that he told him that they were anxious to have the money, but made no statement of a definite character in regard to her redeeming the property; that he never gave any one representing Mrs. Bishop the option to redeem the property at any time whenever the debt could be paid; that he probably told another representative of Mrs. Bishop that what the company wanted was its money; that it did not want the property particularly, and that witness was willing to give them a fair time for taking up the property and paying for it, but there was no promise of a definite character made.

An affidavit for a continuance by one of the defendants on account of the temporary absence from the State of Eberhardt, a material witness for the defense, stated that Eberhardt, if present, would testify, denying, in detail, the conversations with Mrs. Bishop's attorney testified to by him, and would testify, in substance, that precisely the contrary was the fact, and the affidavit being held by the court sufficient to entitle the defendants to a continuance, the complainants, to avoid a continuance, admitted that the witness, if present, would testify as stated in the affidavit.

Under these circumstances, we are not satisfied that the preponderance of the evidence as to these conversations is with the complainants. By the admission made to avoid a continuance, the defendants are entitled to have Eberhardt's

testimony received and weighed precisely as though he had appeared as a witness and had sworn to the facts stated in the affidavit. If he had done so, he would have contradicted, fully and circumstantially, the evidence of Mrs. Bishop's attorney, and the attorney's testimony in relation to conversations with Wrenn are in substance and legal effect contradicted by him. The issues of fact thus made seem to have been found by the court in favor of the defendants, and we see no ground upon which we would be justified in reversing that finding.

But even if we should accept the evidence given on the part of the complainants as true, it wholly fails to prove any binding contract extending Mrs. Bishop's right to redeem beyond the statutory period. And the evidence fails to show that the assurances thus given were ever relied or acted upon by her, or that she was thereby induced to alter her position, so as to call into operation the doctrine of estoppel.

It is to be noticed that, while the judgment in the first attachment suit was recovered in September, 1876, the sale thereunder did not take place until August 30, 1880, and the sheriff's deed was not executed until December 6, 1881. It may be that the enforcement of the judgment was thus delayed for almost four years in consequence of the importunities of Mrs. Bishop and her attorney, and the willingness on the part of the association and its trustees to give her ample opportunity to pay her debt and redeem her property, and we may well suppose that the assurances testified to by the complainant's witness, if made at all, were made during that interval, while the trustees were postponing action for the purpose of enabling her to redeem. But neither during that time, nor up to the date of her death, which occurred in the year 1886, does she appear to have made the slightest attempt to redeem, nor did she even pay the taxes during any portion of that period. It is admitted that the trustees have, by purchase of tax titles, redemption from tax sales, and payment of taxes,

paid all the taxes and assessments levied or assessed upon the lots in Orvis' subdivision, from the year 1873, up to and including the year 1890.

For the reasons above set forth, we are of the opinion that the court below was correct in finding that the complainants had not made out or shown such facts as entitled them to redeem the lots in Orvis' subdivision, and in decreeing that their prayer for relief, so far as it related to those lots, be denied.

It remains to be determined whether that part of the decree, which allows redemption of block 62 should be sustained. It should be remembered that in the first attachment suit, the appearance of Mrs. Bishop was entered by her attorney, so that the judgment in that suit was a personal judgment against her. The judgment being *in personam,* the notes by which the indebtedness was previously evidenced became merged in the judgment, and were no longer, for any purpose, the evidence of any indebtedness from Mrs. Bishop to the payee therein named. The second attachment suit however was brought upon the notes and upon them alone. In that suit there was no personal service, and the judgment was only against the property and was not *in personam.* It thus appears that that judgment was rendered for an indebtedness which did not exist, but which had been merged in the former judgment. The notes could no more be made the basis of another recovery than they could if they had been paid in full and cancelled. Under these circumstances we think it equitable and proper for the court to open up that judgment and the proceedings under it, for the purpose of permitting the heirs of Mrs. Bishop to pay the balance of the first judgment, which was still a lien on block 62, and thus redeem that block from the deed of trust securing the original purchase money, evidenced at first by the notes, and afterwards by the judgment in the first attachment proceeding.

The decree of the Superior Court will accordingly be in all things affirmed.                    *Decree affirmed.*