## HAMRICK et al. v. BRYAN et al.
### No. 1203.

District Court, N. D. Oklahoma.
Nov. 23, 1937.

F. A. Bodovitz and Donald L. Brown, both of Tulsa, Okl., for complainants.

Rollin E. Gish, of Tulsa, Okl., for himself and interveners.

Underwood, Canterbury, Pinson & Lupardus and Yancey & Spillers, all of Tulsa, Okl., for defendants.

Chas. R. Bostick, of Tulsa, Okl., pro se.

FRANKLIN E. KENNAMER and MURRAH, District Judges.

This is a suit by shareholders of Imperial Royalties Company, a business trust, to enjoin the transfer of assets of the trust estate to a corporation, and for removal of the present trustees, with an accounting and the appointment of successors, and other relief of an incidental nature.

The trust was organized in 1920 under the sanction of the laws of Oklahoma, to engage in the oil and gas royalty business, the declaration of trust vesting the management in three trustees. For a number of years succeeding its formation, the trust was an active and extensive purchaser of royalties and mineral interests, acquiring numerous and valuable properties throughout the Mid-Continent area. Also, in the meantime, its issued and outstanding stock reached the large total of more than 7,200,000 shares, of four different classes. Its business was halted by an action in the state district court of Tulsa county, which, among other things, resulted in the appointment by that court on November 6, 1933, of Curtis F. Bryan as receiver for the trust estate, and the subsequent resignation of the then trustees. In the course of the litigation, the state court entered an order returning the control and management of the trust estate to successor trustees appointed by the court, namely, Curtis F. Bryan (designated as managing trustee), Chas. R. Bostick, and Paul L. Sisk, all three of whom are the present trustees, and defendants herein. These trustees assumed management under the court order on March 5, 1935, but the state court receivership was not terminated until November 14, 1935.

Some time in 1936, these trustees conceived a plan for the transfer of the principal assets of the trust estate to a corporation to be created for that purpose. This culminated in the organization on February 15, 1937, under the laws of Delaware, at the instance of said trustees and with themselves as the initial directors and principal officers, of the defendant corporation, Toklan Royalty Corporation, and the execution on February 24, 1937, between this corporation and the trust of a contract denominated "Purchase Agreement," which was signed on behalf of the Imperial by Bryan, Bostick, and Sisk, as trustees, and on behalf of the Toklan by Bryan, as president, with Sisk, as secretary, attesting. As this is the contract, the performance of which complainants seek to enjoin, and since it is the axis about which the main sphere of controversy herein constantly revolves, its full text is set forth in the subjoined note.

As one of the preliminary steps in their transfer plan, the trustees employed an appraisal engineer to appraise the assets of Imperial. His appraisal, as of December 1, 1936, undertook to state two different values for the properties; one, the realization to be expected from them in the event of liquidation, the other, an amount which might be properly called their "going concern value." The latter was fixed at $1,007,127; the former at $582,768. This liquidation value was the figure used as the amount of what is termed the purchase price in the "Purchase Agreement" between Imperial and Toklan.

With the above partial outline of the factual situation as a preface, to be supplemented at other points herein by further details of the evidence, we pass now to the consideration of the contentions of the parties relative to the proposed transfer of assets which has created the major issue in the case.

Complainants assert that the trustees have been unfaithful to their trust in attempting to make this transfer to the Toklan; that the articles of trust do not authorize such a transaction, and that it is a sale in name only—its effect and substance being merely an exchange of assets of Imperial for stock of Toklan. It appears to be conceded by defendants that the trust declaration does not confer power on the trustees to exchange the trust assets for stock of a corporation, and, unless the "Purchase Agreement" comprehends a sale for a cash consideration, it cannot legally be consummated against the objection of dissenting stockholders. However, defendants earnestly insist that the transaction was such a sale.

■ After a close study of this contract, the situation of the contracting parties, and all the surrounding circumstances, we agree with complainants that the transaction in its real essence is only an exchange of trust assets for stock of the corporation, and not a sale.

It is quite true that certain assets of the Imperial were reserved from the transfer to be made to Toklan, but the value of these was so negligible it cannot in fairness be contended that the effect of the transfer would be otherwise than to strip the Imperial of all its properties. The Toklan, as a corporate entity, was without assets until effect should be given to the plan of acquisition of Imperial assets. Before this plan could be operative, it was required that two-thirds of the shareholders of Imperial must accept stock in Toklan for their interest in Imperial. Certainly no cash was to pass for this two-thirds interest. The shareholders of Imperial not choosing to take stock in Toklan were to be paid in money to be realized by a public offering of stock of Toklan. In reality this would be only a change in the personnel of shareholders, that is to say, the new subscribers for the stock necessary to be sold by Toklan to make the transfer plan effective merely buy an interest in Imperial assets from those shareholders of Imperial who do not elect to take stock in the corporation. We think the case of Jackson v. McIntosh (C.C.A.5) 12 F.2d 676, strongly supports our conclusion of no sale.

■ But were it possible to adopt the theory of a sale for cash as defendants insist, what then as to its validity in a court of equity? We find a corporation organized by Bryan, Bostick, and Sisk; the first named, its president; the second, its vice-president; and the last, its secretary. The three of them constitute its board of directors. This corporation undertakes to contract with a business trust for all its assets of value, and the contract is made on behalf of the trust by the same three above-named persons, who are its trustees. We think the trustees were remiss in their duty of loyalty to their cestuis que trustent when they assumed to deal with themselves as the agency representing the opposite contracting party. We cite the following excerpt from the Restatement, Trusts, § 170, p. 432: "The trustee violates his duty to the beneficiary not only where he purchases trust property for himself individually, but also where he has a personal interest in the purchase of such a substantial nature that it might affect his judgment in making the sale. Thus, a trustee violates his duty if he sells trust property to a firm of which he is a member or to a corporation in which he has a controlling or substantial interest."

■ At the time of the making of the "Purchase Agreement," Bryan, Bostick and Sisk were in absolute control of the Toklan Corporation. In truth, it may be said that they were the corporation, and in contracting with themselves as trustees of the Imperial the situation is substantially the same as though they had contracted to purchase individually the assets of Imperial. The same temptation to consider the advantage of the purchaser rather than that of the beneficiaries of the seller would exist in either event. The courts of equity do not lend approval to contracts made with both contracting parties sitting on the same side of the table and in the same chairs to bargain concerning the valuable rights of others, especially is this so when the contractors, in one of their dual capacities, are acting as trustees of an express trust, imposed with the duty of dealing solely in the interest of the beneficiaries. As applicable here, see 65 C.J. § 642, p. 768 et seq. The trustees, of course, disclaim any personal interest in the proposed "sale." This, however, would not save the transaction, but it may be here observed that the original plan for acquisition of the assets by Toklan, reserved to the trustees, as individuals, the option to purchase a large block of Toklan stock. Although this option was stricken from the final plan, its presence in the first proposal is a strong circumstance to indicate that the trustees were expecting personal benefit from the transaction. However, the trustees were, as already mentioned, the initial directors and principal officers of the new corporation, with reasonable assurance of considerable length of tenure in such positions. Manifestly, such a relationship would compel a very material self-interest in the corporation on their part.

■ Another inhibition arising against the proposed "sale" is the fixing of the purchase price at the figure of $582,768, the appraised liquidation value, when it appears that the expert who made such appraisal also placed a value on the Imperial assets in the amount of $1,007,127 upon a going concern basis. Defendants admit that the trustees could make no valid sale unless the

price obtained thereon is the fair market value of the properties, but strongly urge that the appraised liquidation value is the fair market value, since, so they say, the trustees are required by the terms of the trust declaration to liquidate the trust by December 1, 1940. It is proper to interpolate here that the original trust agreement provided the duration of the trust to be: "* * * for the period of twenty (20) years, and lives in being."

Also, it provided that the declaration of trust might be amended by the trustees, provided such amendment was in conformity to the laws governing common-law trusts. By amendments made prior to the initiation of the plan of acquisition of the trust assets by Toklan, the duration was fixed "for the period of twenty (20) years from December 1, 1920." Because this is a business trust, and by reason of terms of the Oklahoma statute (6 Okl.St.Ann. § 295) authorizing the formation of such trusts for a period of "not to exceed twenty-one (21) years, or to the period of the life or lives of the beneficiary or beneficiaries thereof," which when reasonably construed should permit an enlargement of the time of duration by further amendment of the trust agreement, we cannot agree with the contentions of defendants that an imperative obligation to liquidate the trust assets by December 1, 1940, was imposed upon the trustees. A business trust, such as this, withdraws no property from commerce and is not within the reason or the terms of what'is called the "rule against perpetuities." Hart v. Seymour, 147 Ill. 598, 35 N.E. 246; Howe v. Morse, 174 Mass. 491, 55 N.E. 213. Also, see annotations, 7 A.L.R. 618, 58 A.L.R. 521.

Furthermore, we think the cited Oklahoma statute was never intended to compel, and does not compel, a sacrifice liquidation of a business trust at the end of the period for which it may be formed. Sound reason is against such a construction of the statute. Under the express provisions of the Oklahoma statutes (18 Okl.St.Ann. § 1), a corporation organized for a limited term of years may renew its charter for a like term. In the absence of an express statutory prohibition, it occurs to us that, for the better preservation of the values of properties acquired by cestui que trustent through the organization of a business trust of such a character as the Imperial, it is more in consonance with fair and just legislative policy and intent to read from the

statute the right to properly avoid forced sale loss by a conveyance to a new trust agency with the same powers of the old and with a period of duration conforming to the statutory requirements. Absent the necessity for liquidation by December 1, 1940, there is, of course, no tenable basis for contending that the liquidation value of the assets is their fair market value. The correct view, and that we think supported by the authorities, should require at sale at the fair market value of the properties based on the business being an established going concern. American Seating Co. v. Bullard (C.C.A.6) 290 F. 896; Geddes v. Anaconda Copper Mining Co., 254 U.S. 590, 41 S.Ct. 209, 65 L.Ed. 425.

Applying this test, we are obliged to hold that the trustees were recreant to their trust in agreeing to a "purchase price" so grossly inadequate according to the valuation fixed by their own expert. Therefore, even though the transaction could be considered as a sale, it should be enjoined because of the inadequate sale price. Mason v. Pewabic Mining Co., 133 U.S. 50, 10 S. Ct. 224, 33 L.Ed. 524.

Complainants further charge the trustees with abuse of the powers granted them by the declaration of trust, in that they have attempted to change the scope of the trust business and its method of management by the proposed transfer to Toklan, a corporation with radically different powers and method of management from those of the trust. In a case where a similar question was presented, Greer Investment Co. v. Booth, 62 F.2d 321, 324, decided by the Circuit Court of Appeals of this Circuit, it was said: "It will be noted that, under the provisions of the declaration of trust, the business of the Trust was restricted to the owning, buying, and selling of oil and gas royalties, and the trustees were expressly prohibited from engaging in any other business. On the other hand it will be noted that the Corporation was authorized to engage generally in buying, selling, and dealing in petroleum and gas properties and interests. This, of course, included many things not embraced in the term 'royalties.' It will be further noted that the management of the Trust is expressly vested in the trustees, and the shareholders had no voice in such management; while under the articles of incorporation the management of the Corporation was vested in the owners of the common stock, the directors elected by the common stock-

holders, and the officers elected by such directors. We are of the opinion that the trustees did not have the power to change so radically the scope of the business and the method of managing the Trust."

The scope of the business and method of management of Imperial as fixed in its declaration of trust are practically identical with those of the trust under consideration in the Greer Case, while the purposes for which the Toklan was chartered are in several respects broader in scope than those of the corporation involved there. Consequently, we hold, as was held in the Greer Case, that the trustees have undertaken, without authority conferred by the declaration of trust, to engage the beneficiaries of the Imperial trust in a business radically different in scope and in its method of management. It is pertinent to note here that in the Greer Case 97 per cent. of the shareholders of the trust had agreed to the transfer, while in the present case not over 72 per cent. have assented. In passing, it may be remarked that the Greer Case parallels this one in many essential features, and at one time was considered by the trustees herein as an insuperable barrier to action of like nature to that which they have attempted in the proposed transfer to Toklan, as witnessed by their signed communication to the shareholders under date of March 6, 1935, in which they state:

"It has been suggested from certain quarters that the interests of the shareholders might be served by transforming the trust estate into a corporation. Exhaustive study of the advantages and disadvantages, and legal possibilities of such a course, have been pursued, with the resultant conviction on the part of interested attorneys that an attempt to pursue such a course could result only in additional expense and litigation, the courts having previously held, in the case of a trust estate with a declaration of trust almost identical with our own, that such a transformation was a legal impossibility. See Greer Inv. Co. v. Booth (C.C.A.) 62 F.2d 321."

██ The trustees assumed the management of Imperial on March 5, 1935, and during the period from that date to the filing of this suit had purchased only two small royalties for a combined price of $2250, both being purchased in late October, 1936. Complainants urge that, since the evidence shows that during the period of their management there were many opportunities for favorable royalty purchases, the neglect of the trustees to make investments of substantial amounts therein is such neglect of duty toward their cestuis que trustent as warrants their removal. On this score, the trustees again excuse themselves with the reiteration that the trust was required to be terminated by December, 1940, and it was not wise on this account to make investments of trust funds, and also the litigation they were engaged in because of bankruptcy proceedings instituted kept them from such investments. From what has already been said herein, we consider the first offered excuse as insufficient, and the last we think, containing some measure of justification, is not wholly sound, since these same bankruptcy proceedings were not deemed by them of such importance as to prevent during the same period distributions to shareholders, although in bankruptcy the creditors of the trust would be prior claimants over shareholders of the trust funds. However, we do say that we would not consider this charged neglect sufficient of itself to require a removal of the trustees, but it is a substantial complement to the other complaints hereinbefore discussed which we do hold are ample in law and in fact to justify a new management for the trust. We note that it has been held by the Supreme Court that the neglect to invest can of itself constitute such a breach of trust as to warrant the removal of a trustee. Cavender v. Cavender, 114 U.S. 464, 5 S.Ct. 955, 29 L.Ed. 212.

██ The evidence discloses that, since their assumption of the management of the trust estate, the trustees have bought a number of shares in the trust. These purchases were made through brokers with whom the shares had been listed for sale. Defendants cite authorities to the effect that shareholders of a business trust are not incapacitated from acting as trustees thereof. To us, it seems there could be no valid objection to a shareholder coming into a business trust upon its organization on the same basis as the other shareholders, thereafter acting as a trustee. But, manifestly, a trustee, by virtue of his position is bound to have a more intimate knowledge of the real worth of the trust assets than the average shareholder, particularly where the shareholders are so numerous and scattered as in this case, and in any purchase from a shareholder naturally the trustee would have a great advantage. Therefore, it would seem that a trustee is not discharging the full measure of his owing fidelity

to a share-holding beneficiary, when the trustee buys the interest of such beneficiary, even on a quoted market, through a broker and fails to have disclosed to the beneficiary that the trustee is the purchaser. That is the criticism leveled at the purchases made by the defendant trustees here, and we believe it is proper criticism. No case in precise point has been cited by either side, and we have found none. However, it is a well established principle of the law of trusts that the utmost loyalty is required of every trustee no matter what may be the form of the trust toward the beneficiary, and it would be no new extension of that doctrine to lay an obligation upon a trustee of such a business trust as the Imperial, compelling him, as a condition precedent to the validity of his purchase, to inform such shareholder that he, the trustee, is to be the purchaser, and at the same time to acquaint the shareholder with all the knowledge possessed by the shareholder as to the value of such shares. To argue, as do the defendants here, that only the selling beneficiary may avoid such sale (which is legally correct), is far from the mark. It is not a question of the rescission of any particular sale of that character; the pertinent question is, Did the trustees conduct themselves loyally and faithfully toward their trust and its beneficiaries? Answering that question, we are constrained to say that we consider these purchases by the trustees as acts of disloyalty, properly to be considered as additional weight in the scale against the trustees.

Action affecting the rights of holders of Preferred stock of the Imperial, taken during the period of service of the present trustees, also presents a serious issue in the case. The trust had issued four classes of stock. They were, Preferred, otherwise designated as Dollar Par, No Par Common, Class A Preferred, and Class A Common. In many instances, Common stock was given as a bonus on the purchase of Preferred. The Preferred possessed greater rights than the Common, and provided for the payment of dividends. When the trustees, following the termination of the receivership, made a disbursement to the shareholders, they paid dividends only to the holders of Preferred stock, which was apparently their legal obligation. Thereafter, the trustees made application to the state district court of Tulsa county, purporting to obtain directions from the court with respect to distributions to all share-

holders. No notice of this application was given to the shareholders, nor did the trustees notify them of its pendency, and, so far as the evidence discloses, they did not actually know of the pendency of the application. On November 8, 1935, the state court entered an order on this application, purporting to direct the trustees to pay out funds of the trust estate, whenever deemed proper and advisable and in the best interest of the trust estate, to the holders of Dollar Par Preferred and the Common, in equal amounts; to the holders of Class A Preferred and Class A Common in equal amounts. In other words, the state court, without notice to the shareholders, undertook to change the rights of shareholders. This action of the court was not opposed by the trustees, and apparently they made no effort to protect the rights of holders of the Preferred stock. This, we think, was a neglect of their duty to these beneficiaries, and the order resulted in an individual benefit to the trustees. The testimony showed that at least one trustee had purchased Common stock, paying a relatively small price therefor as compared to the price he paid on purchases of Preferred. At the time of the purchase of the Common, he knew of the existence of the court order giving the Common an equality with the Preferred. As further evidence of our conclusion, the proposed plan for the transfer of Imperial assets to Toklan made provision for equalizing the rights of Common and Preferred shares. Therefore, the trustees have been guilty of a breach of their trust in this transaction. They should have protected the rights of the Preferred shareholders, but not only failed to do so, but apparently sided in the destruction of the rights of such shareholders.

The state court was without authority to cut off the rights of the Preferred stockholders in the manner as done by this order. Probably that court was without authority to diminish the rights of such shareholders, even had the order been entered upon proper notice. A contract between a corporation or a trust and the holders of its stocks cannot be changed, or the stockholders' rights impaired, without their consent, by any subsequent action of the corporation or trust. Cases supporting this proposition but involving corporations are the following: Pronick v. Spirits Distributing Co., 58 N.J.Eq. 97, 42 A. 586; Hazeltine v. Belfast & M. L. R. Co., 79 Me. 411, 10 A. 328, 1 Am.St.Rep. 330; Mc-

Laughlin v. Detroit & M. Ry. Co., 8 Mich. 100; Willcox v. Trenton Potteries Co., 64 N.J.Eq. 173, 53 A. 474; West Chester & P. R. R. Co. v. Jackson, 77 Pa. 321.

■ The trust could not be modified or changed, except by action of the trustees, and such trustees were entitled to petition a court of equity for approval of their acts. A decree had been entered by the state court appointing the trustees, and ordering them to conduct the business of the trust. The state court, therefore, was without jurisdiction over the trust except as its jurisdiction might be invoked by appropriate petition or application of the trustees. Notice to the beneficiaries of any such application was required if they were to be bound by any order entered thereon. Such an order without notice is invalid. Due process requires that every person shall have the protection of his day in court, and an opportunity to be heard is an essential requisite of due process in judicial proceedings. Postal Telegraph Cable Co. v. City of Newport, 247 U.S. 464, 38 S.Ct. 566, 62 L.Ed. 1215; Truax v. Corrigan, 257 U.S. 312, 42 S.Ct. 124, 66 L.Ed. 254, 27 A.L.R. 375.

In Ochoa v. Hernandez y Morales, 230 U.S. 139, 33 S.Ct. 1033, 57 L.Ed. 1427, it was stated that the guaranty of due process of law inhibits the taking of one man's property and giving it to another, contrary to the settled rules of procedure, without opportunity for hearing. The evidence discloses that, since the entry of the court order of November 8, 1935, the trustees have made two disbursements to shareholders; undoubtedly to the prejudice and contrary to the fixed legal rights of the preferred shareholders. In this, the trustees were unfaithful to their trust on behalf of these shareholders.

There were other matters of complaint against the trustees developed by the pleadings and evidence, but, in the light of the conclusions we have already reached, it is unnecessary to consider them.

■ In accordance with the views above expressed, we hold that the contract of February 24, 1937, between the Imperial Royalties Company and the Toklan Royalty Corporation should be set aside; and the transfer of assets of Imperial contemplated thereby should be enjoined; that the present trustees, Bryan, Bostick, and Sisk should be removed, and successor trustees appointed for the trust estate of Imperial Royalties Company. We further hold that the said trustees shall be required to account to the Imperial Royalties Company for all sums of money expended from Imperial funds in the organization of the Toklan Royalty Corporation, and the attempted carrying out of the proposed plan of transferring the assets of Imperial to the Toklan, except that said trustees shall not be required to account for the sum of $9,500 paid to the appraisal engineer for making the appraisal of the properties of Imperial. We are of the opinion that this appraisal expense was a proper charge against the trust estate, as it was of benefit to such a business concern to have its assets so appraised.

A decree may be drawn in accordance with this opinion and presented for our approval.

NOTE

"This agreement of purchase made and executed in duplicate this 24 day of February, 1937, by and between Imperial Royalties Company, a trust estate acting by and through Curtis F. Bryan, Managing Trustee, Chas. R. Bostick and Paul L. Sisk, Co-Trustees, herein called 'Seller', and Toklan Royalty Corporation, a corporation organized and existing under the laws of the State of Delaware, herein called 'Buyer';

"Witnesseth: That,

"Whereas, under date of December 21, 1936, a certain printed document was issued entitled 'Proposed Plan for the Transfer to Toklan Royalty Corporation (a corporation) of certain of the assets of Imperial Royalties Company (a trust estate)' and was mailed to the shareholders of record of Imperial Royalties Company, a true copy of which printed plan is hereto attached, marked Exhibit 'A' and made a part and parcel hereof, and

"Whereas, Toklan Royalty Corporation has been organized under the laws of the State of Delaware for the purpose of carrying out and consummating said Proposed Plan, and in accordance with the additional terms and conditions herein set forth;

"Now therefore, in consideration of the sum of Ten Dollars, cash in hand paid by Buyer to Seller, receipt whereof is hereby acknowledged, and other good and valuable considerations, and of the terms and covenants hereof, it is agreed:

"Buyer agrees to secure authority under its Certificate of Incorporation with amendments thereto, to authorize the issuance by it of not less than 812,444-1/3 shares of

Series A Common Stock and not less than 40,623 shares of Series B Common Stock. Each of said issues of stock shall be no par value stock. Each share of Series A Common Stock shall have 1/20 of the voting, dividend and liquidation rights of each share of Series B Common Stock, and Series A Common Stock shall be convertible into Series B Common Stock at the ratio of twenty shares Series A Common Stock for one share of Series B Common Stock. Series A Common Stock will be offered only to shareholders of record of Seller, at a subscription price of $.7173 per share. Buyer agrees to offer said shares of Series A Common Stock to the shareholders of record of Seller, at the time a Registration Statement hereinafter referred to becomes effective, at a price of $.7173 per share and accept in payment thereof assignments of the shareholders of Seller of their right to the distribution of the purchase price to be paid by Buyer to Seller for the properties hereinafter described. This cash distribution that will be owing from Seller to its shareholders, on account of division and distribution of the purchase price, by way of return of capital or distribution of capital to said shareholders, is as follows on each of the outstanding shares of Seller:

$1 Par Preferred ................ $.0478
Common ........................ .0478
Class A. Preferred .............. .7173
Class A. Common ................ .7173

"Buyer agrees to cause a Registration Statement to be filed with the Securities and Exchange Commission, Washington, D. C., for the registration of 812,444-1/3 shares of Series A. Common Stock to be offered under said Proposed Plan, and 40,-623 shares of Series B Common Stock. The Series B Common Stock will be offered for a cash price of $14.35 per share, in an amount of shares sufficient to produce in cash the difference between the aggregate assignments of distributive proceeds that will be owing from Seller and the purchase price in the amount of $582,768. Buyer will make the offering, as soon as the same can be done conveniently, after the Registration Statement becomes effective.

"In the event 66-2/3 per cent of the outstanding shareholders of the Seller, arrived at by considering Class A Preferred and Class A Common shares of Seller as having fifteen times the value in final liquidation of $1 par Preferred and Common Shares, do not subscribe to Series A Common Stock of Buyer, and accept the terms and benefits of the Proposed Plan, then this contract shall cease and determine and be at an end.

"Seller agrees, in accordance with the conditions of the Proposed Plan, to sell and deliver to Buyer all of the assets owned by it as of the commencement of business on the 1st day of December, 1936, free and clear of any and all claims, excepting only cash funds on hand as of the close of business on November 30, 1936, and certain unliquidated claims and judgments more particularly described in Exhibit 'A' and designated as 'Excepted Assets' and Seller shall reserve and retain all of said excepted assets. The conveyance of said assets, if the purchase is completed hereunder, shall be made by valid assignments and conveyances and Seller agrees to furnish Buyer any assurances of title that are required by it.

"If the sale is completed, Buyer shall be entitled to all funds collected in operating the business of Seller from December 1, 1936, except collections on account of any of the excepted assets, and Buyer shall pay and be responsible for the operating and other expenses of carrying on the business of Seller after the 1st day of December, 1936; provided however, that if, in the ordinary course of business, any properties included among those to be sold and delivered to Buyer hereunder are sold, lost through foreclosure or otherwise encumbered or alienated, or if new properties are acquired, with proceeds from the sale or through an exchange of any of the scheduled assets, after the 1st day of December, 1936, then said transactions shall be for the account of Buyer.

"It is agreed that the shareholders of Seller shall have a period of six (6) months from the date when the Registration Statement, relating to Buyer's stocks, becomes effective within which to subscribe for Series A Common Stock shares of Buyer and said date is designated as the 'primary closing date.' This date may be extended by the Directors of Buyer, with the consent and approval of the Trustees of Seller. Within thirty (30) days after the expiration of the primary closing date, as finally established, providing more than 66-2/3 per cent of 812,444-1/3 shares of Series A Common Stock of Buyer have been subscribed for by shareholders of Seller, Buyer agrees, upon the tender and delivery to

it of conveyances of title to all of said scheduled assets, to pay to Seller the sum of Five Hundred Eighty-two Thousand Seven Hundred Sixty-eight Dollars ($582,768) as follows:

"(a) By delivering to Seller assignments executed by record shareholders of Seller conveying to Buyer their rights to collect and receive their proportionate part of the cash proceeds of the sale of said assets comprehended hereunder;

"(b) By paying any balance between the total of distributive cash assignments and $582,768, in cash.

"Buyer agrees to offer first to the shareholders of Seller who subscribe for Series A Common Stock shares, the shares of Series B Common Stock that may be offered to the public for the purpose of raising the additional cash funds necessary to complete the purchase price, at a price of $14.35 per share. But if the shareholders of Seller who subscribe to Series A Common Stock do not promptly avail themselves of the right to purchase Series B Common Stock shares as herein provided, then Buyer may offer same to the public at a price to net Buyer not less than $14.35 per share.

"Seller agrees to warrant the title to all of the properties to be sold and delivered to the Buyer hereunder and to defend Buyer against and save it harmless from any adverse claims asserted in respect to said titles or rights.

"If for any reason beyond the control of Buyer the Registration Statement does not become effective, or if for any reason the Proposed Plan for the acquisition of scheduled assets by Buyer from Seller fails or is not completed, then Seller agrees to protect Buyer against and save it harmless from any loss, costs or expenses in connection with its organization, auditing expenses, engineering expenses, legal expenses and all other expenses incurred in carrying out or attempting to carry out the proposed plan and in registering its securities with the Securities and Exchange Commission.

"Time is expressly declared to be of the essence of this contract, and the terms and conditions hereof shall bind and benefit the respective parties hereto, their heirs, representatives, successors or assigns; provided however, that Buyer may not assign or sell this contract or any of its rights hereunder without first having secured consent of Seller."