[Civ. No. 682. Fourth Appellate District.—December 6, 1933.]

R. R. BERNESEN et al., Respondents, v. EUGENE B. FISH et al., Appellants.

Walter F. Haas, H. C. Johnston, G. E. Kerrin, Grant Holcomb, W. C. Shelton, and George W. Burch, Jr., for Appellants.

O'Connor & Findlay for Respondents.

MARKS, J.—Plaintiffs instituted this action to recover money which they had paid upon the purchase price of land in San Bernardino County, together with expenses properly incurred in preparing to enter upon the land, possession or title to which they never received. They recovered

judgment for $2,272.83, the amount paid on the purchase price, $528.76 accrued interest, and $1125 expended in preparing to move onto the land.

The complaint is in three counts. In the first count it is alleged (1) that the defendants are copartners or joint adventurers; (2) that J. B. Roof, Inc., was the duly appointed and authorized agent of the defendants in the sale of the property in San Bernardino County; (3) that through this agent the plaintiffs entered into a written contract for the purchase of a portion of this property and paid $1657.73 on the purchase price in cash and made subsequent installment payments in the total sum of $616.05; (4) that the purported sale to them by the agent was never approved and that they demanded the return of their money, which was not returned, but converted to the use of the defendants. The second count repeated all the allegations of the first with the exception of the last allegation and added the further allegations that plaintiffs demanded either the return of their money or that a formal contract of sale and purchase of the real property be executed, which defendants refused to do; that defendants by their representations and actions led plaintiffs to believe that the contract of sale would be executed and performed by defendants and thus deceived plaintiffs; that plaintiffs believed and relied upon the representations of defendants and their agents and spent money in preparing to move onto the land, particularly in growing avocado trees, to plaintiffs' damage in the sum of $4,500. The third count stated a cause of action for money had and received in the sum of $2,273.78.

It will only be necessary to consider the answer of the defendants who are active in the prosecution of their appeals as the other answers are of no particular interest here.

The defendants Eugene B. Fish, D. A. Beck, S. E. Beck and W. F. Beck joined in an answer in which the material allegations of the complaint, upon which their liabilities rested, were denied either directly or for lack of information and belief. In a separate affirmative defense it is alleged that these defendants are holders of a beneficial interest "in Metropolitan Trust No. 108 sometimes designated as Muscoy Syndicate", and that no permit for the sale of these beneficial interests had been issued by the corporation commis-

sioner of this state. The separate answer of I. W. Fuqua also denied the allegations of the complaint, but did not plead any affirmative defense. He did not raise the issue of the lack of a permit of the commissioner of corporations for the issuance of certificates of beneficial interests in Metropolitan Trust No. 108.

The trial court found that some time prior to September 15, 1926, the defendants J. B. Roof and Charles H. Jonas secured an option to purchase a large tract of land of about 8,600 acres in San Bernardino County, which included the parcels involved in this controversy; that thereafter Roof and Jonas organized a syndicate consisting of themselves and about eighty others, four of whom were the defendants Eugene B. Fish, D. A. Beck, S. E. Beck and W. F. Beck. This syndicate furnished the money with which the initial payment on the purchase price of the 8,600 acres was made and to do the work in connection with a plan to subdivide and sell the property; that title to the real estate was conveyed to Roof and Jonas, and by them and their wives conveyed to the Metropolitan Trust Company in trust; that the trust was designated as No. 108.

The findings set forth the declaration of trust *in haec verba* and as its legal effect is in sharp dispute between the parties it will be necessary to summarize its terms in considerable detail. It is dated December 27, 1926. It does not appear to have been recorded.

The declaration of trust designates Charles H. Jonas and wife, and J. B. Roof and wife, as trustors, the Metropolitan Trust Company of California, trustee, and Charles H. Jonas, beneficiary. It recites that the trustee had received a deed dated September 15, 1926, recorded September 30, 1926, by which the trustors conveyed to it the particularly described real property in San Bernardino County; that the real property was represented free of encumbrances except taxes for the fiscal year 1926–1927, conditions, restrictions, reservations, easements and rights of way, and a deed of trust dated September 15, 1926, executed by the trustors to secure payment of their five promissory notes in the total principal sum of $450,000. After particularly describing the terms of the deed of trust the declaration of trust proceeds:

"Now therefore, said Metropolitan Trust Company of California, trustee hereunder, as aforesaid, hereby certifies

and declares that it holds and will hold title to the hereinbefore described property in trust, with power of sale for the benefit of Charles H. Jonas as the beneficiary hereunder under the terms and conditions set forth in this declaration of trust, and for the following uses and purposes namely:''

The beneficiary bound himself to perform the following: to pay all taxes before delinquency; to pay, when due, all other claims and liens affecting title to the property; to provide insurance upon all buildings on the property; to defend any action affecting title to the property or the rights of the trustee therein; ''to protect, preserve and defend the property covered hereby and the title thereto, and to keep said property in good condition, by proper care, inspection, repair, cultivation, irrigation, fertilization or otherwise, and to permit no waste or deterioration thereof''; to commence and continuously prosecute and complete the installation of improvements in each subdivision of the property within six months from the date of the first sale of a lot or lots; to protect and save the trustee and land harmless by reason of any improvements or promises to prospective purchasers relative thereto; to repay to the trustee within sixty days all sums advanced by it. It is further provided that if the beneficiary failed to make any of the payments or perform any of the acts just enumerated the trustee might *''enter and take possession of the trust property''*, make the payments or perform the acts, but that it should not be obligated so to do.

The declaration of trust provided that ''it is agreed that the real property hereinbefore described consisting of approximately eighty-six hundred (8600) acres, may be subdivided and/or resubdivided and improved by the beneficiary hereunder in such manner as hereafter shall be agreed upon by said trustee and said beneficiary, all costs, and expenses incident thereto to be borne solely by said beneficiary''. Limitations on successive subdivisions are detailed which it is not necessary to particularly describe.

The trustee is empowered to grant easements and rights of way which may be considered necessary, desirable or proper, by the trustee and beneficiary. It is also given power ''if requested by the beneficiary'' to grant portions of the trust estate for parks, public buildings, schools and other purposes. The improvements ''may include the con-

struction of a hall or halls, an auditorium, offices or other structures of such number, character and cost as the beneficiary and trustee may determine upon'' which may be sold by the trustee at the price and upon the terms agreed upon by the trustee and beneficiary.

The declaration of trust contains elaborate provisions concerning the reservation to the trustee of all water rights in all deeds, and the organization of mutual water companies. The conveyance of these water rights shall be made ''from time to time, as the beneficiary shall, in writing direct''.

The declaration of trust contains the following: ''Said lands conveyed to said trustee as aforesaid, are and will be held for the following uses and purposes: First: to sell and convey any of the hereinabove described lots, any lot in any future subdivision or resubdivision of any portion of the trust property, or unsubdivided parcels of the trust property of any dimension whatsoever; the sales prices of property to be not less than those agreed upon by said trustee and said beneficiary as indicated on a schedule, of sales prices for each unit or unsubdivided parcel, to be furnished said trustee prior to the time that each unit or part thereof, or unsubdivided parcel, is offered for sale.'' It is not necessary to detail the terms upon which sales are to be made except to note that it appears that there is to be a ''selling agent'' for the sale of the property.

The plan of distribution of the proceeds received from the sale or lease of the trust property is set forth in detail. From the receipts from the sale or lease of the property, as a whole, or from unsubdivided parcels, the trustee is authorized without other authority to pay the following: Costs, fees and expenses; five per cent of the sales price, or lease returns, to the selling agent; taxes and assessments; interest on the trust deed indebtedness; certain bills for services or materials to satisfy and discharge the obligations of the beneficiary; a portion of the trust deed indebtedness and certain other liens and encumbrances; the unexpended portion to the beneficiary or beneficiaries. When authorized by the beneficiary it may pay costs, fees, expenses or commissions, to other than the selling agent; bills for improvement and subdivision of the trust property.

Proceeds from sales of subdivided portions of the property shall be distributed as follows: Payment of the costs, fees and expenses of the trustee; thirty-five per cent commission to the agent making the sale. This is intended to net the agent five per cent after he pays his costs and expenses of sale. This percentage may be increased or decreased upon recommendation of the "business manager" after detailed investigation shows that the selling agent is not receiving five per cent commission net. Other payments are to be made in much the same manner as those from gross sales or rentals, except that the authority of the "business manager" is required in some instances.

The declaration of trust contains the following: "The Trustee hereunder is hereby authorized to act upon the written order and direction of Charles H. Jonas, who shall be known as the Business Manager, in all matters concerning this Trust requiring the consent, authorization, or direction of the Beneficiary hereunder, and any person or persons who hereafter become a Beneficiary or Beneficiaries hereunder by acceptance of the beneficial interest herein agrees to take such beneficial interest subject to the right of Charles H. Jonas to act on behalf of and in the place and stead of each and every one of the Beneficiaries hereafter acquiring any interest hereunder and irrevocably consents to any act that the Trustee shall do upon the written instructions of Charles H. Jonas: PROVIDED, HOWEVER, that the authority of said Charles H. Jonas to so act may be revoked at any time by the filing with the Trustee of a written notice executed by sixty-five per cent (65%) in interest of the Beneficiaries or by an individual or individuals designated by the said Sixty-five per cent (65%) of Beneficiaries in interest."

It is provided that no sale or transfer of any interest under the trust shall be binding until evidence of the sale or transfer has been filed with the trustee. The declaration of trust recognizes the obligation of the beneficiaries for unpaid bills of the trust and provides an elaborate plan for the sale of the beneficial interests of those not paying the portions of such bills after they become due.

It is provided as follows: "It is understood and agreed that provided and when the beneficial interests under this trust are held by eight (8) or more persons—said trustee, during such period or periods, will act in all matters in

connection with the trust, requiring the consent of the beneficiaries hereunder upon the written request and direction of beneficiaries representing at least sixty-five per cent (65%) of the beneficial interests under this trust (as shown by the records of said trustee). Provided said sixty-five per cent (65%) of the beneficial interests be held by three (3) or more beneficiaries; which written request and direction shall be considered—so far as said trustee is concerned —the written request and direction of all beneficiaries under this trust;

"And the present beneficiary—for himself and his successors and assigns hereunder—does constitute and appoint said sixty-five per cent (65%) in interest, but in no event less than three (3) of said beneficiaries, the agents irrevocable of the beneficiaries hereinabove mentioned and for the uses and purposes in this section mentioned and it is understood that the acceptance by each future beneficiary of a beneficial interest under this trust shall constitute a ratification and approval of this trust, and particularly of the provisions of this Article XI, and the appointment of agents irrevocable herein set forth. . . . Said trustee, at its sole discretion, may appoint an agent or agents at any time and from time to time (with full power) to revoke any such agency (also at its sole discretion), to render such services in connection with this trust and the property covered hereby as said trustee may deem advisable; each such agency appointment to be in such form and to contain such conditions and limitations as said trustee shall elect.

"It is hereby agreed that J. B. Roof, Inc., shall receive the first agency appointment, as selling agent hereunder. Said trustee, however, in no event, to be liable to any person for any act, omission, default, defalcation or wrong-doing of any such agent."

The trust may be terminated at any time upon demand of eighty per cent of the beneficial interests. In many other respects the consent of the beneficiary or business manager is made necessary for action by the trustee in administering its office.

The trial court further found that before the transactions with the plaintiffs, Charles H. Jonas caused to be issued beneficial interests to all of the served defendants except the Metropolitan Trust Company and J. B. Roof, Inc., and

that no permit of the commissioner of corporations authorized the issuance of certificates of beneficial interest; that tracts No. 2243, No. 2258 and No. 2324 were subdivided and subdivision maps were recorded in the office of the county recorder of San Bernardino County; that J. B. Roof, Inc., acted as selling agent of the property and sold many lots to various persons between the execution of the declaration of trust and September 3, 1929; that the policies and sales of the selling agent were known to and acquiesced in by Charles H. Jonas as manager; that by such policy of the selling agent there "would issue to a buyer of any portion of said premises, a receipt or contract in accordance with the form hereinafter set forth and would accept from said buyer whatever payment it was agreed said buyer should make thereon. If said down payment was less than 25% of the agreed purchase price said money was paid to the said defendant J. B. Roof, Inc., until such time as the total amount thereof equalled 25% of the full purchase price of the premises agreed to be purchased by said buyer. After said 25% had been paid, then said purchaser would be given a new contract executed by the defendant Metropolitan Trust Company of California and would thereafter, in accordance with the general custom, make his payments direct to the said defendant Metropolitan Trust Company of California. It was the custom and procedure that the payments so made to the defendant J. B. Roof, Inc., were by it paid to the defendant Metropolitan Trust Company of California or an accounting given thereof"; that J. B. Roof, Inc., as agent for the defendants, induced the plaintiffs to purchase a portion of the trust property located at the corner of Duffy Street and Highland Avenue and represented to them that water, domestic and for irrigation, and other public utilities would be installed within a short time and that the property was suited and adapted for the raising of avocados and garden produce; that plaintiffs paid $1656.78 before December 2, 1928, on account of the purchase price; that on that date J. B. Roof, Inc., as agent for the defendants, informed plaintiffs that water and other public utilities could not be placed on the property they were purchasing and induced them to substitute other property which J. B. Roof, Inc., promised would have water on it within a short time; that on Decem-

ber 2, 1928, the substitution of the properties was agreed to and the plaintiffs and J. B. Roof, Inc., signed a receipt setting forth the terms of sale; that credit was given for the $1656.78 already paid by the plaintiffs on their first purchase as the down payment on the second purchase; that plaintiffs paid the further sum of $616.05 on account of the purchase price; that water was not placed on the second tract and Metropolitan Trust Company of California refused to execute a contract of sale for the premises; that plaintiffs were never given possession of nor title to the premises nor received any consideration for the money they had paid which was never returned to them; that the trustee and trust estate received the benefit of their payments; that all the representations to plaintiffs were made with the knowledge and consent of Charles H. Jonas who knew of the payments made by the plaintiffs and who promised that their money would be returned to them; that preparatory to moving onto the first property plaintiffs planted 900 avocado seeds and on December 2, 1928, had 900 avocado trees growing in gallon cans to be transplanted upon the property, and which trees were of the reasonable value of $1125; that because of the failure of the defendants to permit plaintiffs to purchase the property and have possession of it, the trees became root-bound and of no value, to plaintiffs' damage in the sum of $1125.

If all the facts found by the trial court were supported by the evidence our task would be immeasurably easier. If it had been proven, as found, that prior to the execution of the declaration of trust the appealing defendants (except I. W. Fuqua) and others not before this court, had furnished the money with which to purchase the property described in the declaration of trust, which we will hereafter refer to as the "Muscoy Ranch", and that title had been taken in Roof and Jonas, a resulting trust would have been created by operation of law with a beneficial interest vested in each person furnishing a part of the purchase price. (*Zeller* v. *Knapp, ante,* p. 122 [26 Pac. (2d) 704].) The evidence does not support this finding in its entirety.

The evidence discloses that prior to the creation of Trust No. 108, a syndicate composed of about eighty-five persons was organized and a writing was signed which is not in

evidence; that an escrow was established "at the guarantee office of the Security Trust & Savings"; that money was paid into this escrow; that the Muscoy ranch was purchased; that title was taken in the name of Roof and Jonas; that I. W. Fuqua was not a member of this original syndicate. There is no direct evidence that any other appealing defendant was a member of this syndicate.

A list of owners of beneficial interests as of December 1, 1928, containing the names of all appealing defendants was introduced in evidence under the following stipulation:

"The Court: The stipulation is that the list as offered by Mr. Libbey, and compiled by the Metropolitan Trust Company, either by Mr. Libbey personally or under his direction, is a true copy of the records of the Metropolitan Trust Company, as evidenced by the assignments and other papers necessary to transfer beneficial interests according to the terms of the trust, excepting that particular item in the list, known as and shown as certificate held by the Metropolitan Trust Company, which is in fact held by the Metropolitan Trust Company, as trustee for the benefit of another trust."

■ Appellants strenuously urge that the complaint does not state facts sufficient to constitute a cause of action against any of them. Without going into an analysis of the pleading it is sufficient to say that the allegations of the third count are sufficient to support the judgment for the recovery of the money paid by the plaintiffs on account of the purchase price of the land they were trying to buy, together with interest. While the allegations of the second count might be held sufficient to support a judgment for the expenses properly incurred by the plaintiffs in preparing to move onto the land had one been rendered, the allegations of this portion of the pleadings are not satisfactory. As the judgment on this phase of the case must be reversed it is suggested that this portion of the pleading be amended before a retrial of this issue.

■ Appellants next urge that the Metropolitan Trust No. 108 was what is commonly known as a Massachusetts Trust or Business Trust and that no liability is enforceable against the beneficiaries for its debts. The Supreme Court in the case of *Goldwater* v. *Oltman*, 210 Cal. 408 [292 Pac. 624, 71 A. L. R. 871], had occasion to consider the liabilities

of beneficiaries of the strictly Massachusetts Trust or Business Trust and other trusts in the nature of partnerships. It was there said:

"This type of organization (Massachusetts or Business Trust) is nothing more than an attempt to use the old common-law trust for the purpose of carrying on business enterprises.

"Such a trust is brought into being by a declaration of trust, by the terms of which those desiring to invest their capital agree to the creation of a governing group of trustees, the powers and duties of this board being dependent on the terms of the trust agreement. The interest of each subscriber is evidenced by transferable certificates, similar to shares of stock in a corporation and, in this state, subject to the scrutiny of the corporation department. The organization does not dissolve as does a partnership upon the transfer of any share, nor upon the death, insanity or bankruptcy of a subscriber. The trust agreement usually provides that the trustees and not the subscribers are the owners of the property, and the trustees are given, in a true Massachusetts trust, complete control of the management of the business. In the trust agreement it is always provided that the subscribers are not personally liable for any of the acts of the trustees, a freedom from liability which, in this state, is even greater than that accorded to stockholders of corporations, except, since 1929, stockholders in limited corporations.

"Generally stated, a trust of this nature is created wherever several persons transfer the legal title in property to trustees, with complete power of management in such trustees free from the control of the creators of the trust, and the trustees in their discretion pay over the profits of the enterprise to the creators of the trust or their successors in interest. As thus defined it is apparent that such a trust is created by the act of the parties and does not depend on statutory law for its validity. In the case of *Hecht* v. *Malley*, 265 U. S. 144, 146 [68 L. Ed. 949, 44 Sup. Ct. 462, 463], Mr. Justice Sanford referred to such organizations as follows:

" 'The "Massachusetts trust" is a form of business organization, common in that state, consisting essentially of an arrangement whereby property is conveyed to trustees,

in accordance with the terms of an instrument of trust, to be held and managed for the benefit of such persons as may from time to time be the holders of transferable certificates issued by the trustees showing the shares into which the beneficial interest in the property is divided. These certificates, which resemble certificates for shares of stock in a corporation and are issued and transferred in like manner, entitle the holders to share ratably in the income of the property, and, upon termination of the trust, in the proceeds.

" 'Under the Massachusetts decisions these trust instruments are held to create either pure trusts or partnerships, according to the way in which the trustees are to conduct the affairs committed to their charge. If they are the principals and are free from the control of the certificate holders in the management of the property, a trust is created; but if the certificate holders are associated together in the control of the property as principals and the trustees are merely their managing agents, a partnership relation between the certificate holders is created.'

"The leading case in Massachusetts where the so-called control test is fully discussed is *Williams* v. *Inhabitants of Milton*, 215 Mass. 1 [102 N. E. 355]. In that case the question involved was whether the Boston Personal Property Trust was to be taxed as a partnership or as a trust. The court, after discussing certain cases holding the particular trust therein involved created a partnership, and others where it had been held that a trust had been created, stated (102 N. E. 357) that the distinction 'lies in the fact that in the former cases the certificate holders are associated together by the terms of a "trust", and are the principals whose instructions are to be obeyed by their agent who, for their convenience, holds the legal title to their property, the property is their property, they are the masters; while in *Mayo* v. *Moritz* (151 Mass. 481 [24 N. E. 1083], where it was held the instrument created a trust), on the other hand, there is no association between the certificate holders, the property is the property of the trustees and the trustees are the masters. All that the certificate holders in *Mayo* v. *Moritz* had was a right to have the property managed by the trustees for their benefit. They had no

right to manage it themselves nor to instruct the trustees how to manage it for them.'

"The court then held that the Boston Personal Property Trust was a trust and not a partnership, stating (102 N. E., p. 358): 'The certificate holders . . . are in no way associated together, nor is there any provision in the indenture of trust for any meeting to be held by them. The only act which . . . they can do is to consent to an alteration or amendment of the trust created by the indenture or to a termination of it before the time fixed in the deed. But they cannot force the trustees to make such alteration, amendment, or termination. It is for the trustees to decide whether they will do any one of these things. All that the certificate holders . . . can do is to give or withhold their consent to the trustees taking such action.'

"In another leading case decided shortly after *Williams* v. *Inhabitants of Milton, supra,* the same court said concerning the controlling features between a trust and a partnership: 'A declaration of trust or other instrument providing for the holding of property by trustees for the benefit of the owners of assignable certificates representing the beneficial interest in the property may create a trust or it may create a partnership. Whether it is the one or the other depends upon the way in which the trustees are to conduct the affairs committed to their charge. If they act as principals and are free from the control of the certificate holders, a trust is created; but if they are subject to the control of the certificate holders, it is a partnership.' (*Frost* v. *Thompson,* 219 Mass. 360 [106 N. E. 1009, 1010]; see, also, *Horgan* v. *Morgan,* 233 Mass. 381 [124 N. E. 32]; *Sleeper* v. *Park,* 232 Mass. 292 [122 N. E. 315]; *Crocker* v. *Malley,* 249 U. S. 223 [2 A. L. R. 1601, 63 L. Ed. 573, 39 Sup. Ct. 270, see, also, Rose's U. S. Notes]; *Mayo* v. *Moritz, supra.*)

"In those jurisdictions other than Massachusetts that have recognized this type of organization as a trust, it is the retention or nonretention of ultimate control by the shareholders which has been treated as a determining factor in the question as to whether the particular organization is a trust or a partnership. (*Betts* v. *Hackathorn,* 159 Ark. 621 [31 A. L. R. 847, 252 S. W. 602]; *Schumann-Heink* v. *Folsom,* 328 Ill. 321 [58 A. L. R. 485, 159 N. E. 250];

Sears on Trust Estates as Business Companies, 2d ed., 144.) By the weight of authority, where the trustees have complete control of the business, the creators of the trust are treated as are the *cestuis que trust* of an ordinary equitable trust, and are exempt from direct personal liability to the creditors of the business; but if the trustees are subject to the control of the creators of the trust, the latter or their successors are liable as partners. (*Rand* v. *Morse,* 289 Fed. 339; *Hart* v. *Seymour,* 147 Ill. 598 [35 N. E. 246]; *Williams* v. *Boston,* 208 Mass. 497 [94 N. E. 808]; *Frost* v. *Thompson, supra.*)''

When the instant case is measured by these rules it is evident that the control of the trustee over the property of the trust estate is far too limited and the control over it and the actions of the trustee by the beneficiaries is too complete to permit any doubt of the fact that the trust here in issue cannot be classified as a Massachusetts or Business Trust. It comes within the other classification in which the beneficiaries reserve to themselves such control over the trustee and trust estate that a specie of partnership is created. It makes no difference that many of these powers of control are to be exercised by and through a ''business manager''. The beneficiaries expressly appointed him their agent for such purpose.

Appellants next urge that as they were holders of certificates of beneficial interest under Trust No. 108, for the issuance or sale of which no permit had been issued by the commissioner of corporations, they acquired no interest under these certificates and could not be held for the debt to the plaintiffs. There is nothing in the pleadings of the plaintiffs which would necessarily put in issue the necessity of such a permit. The issue was presented by the answer of the appealing defendants, except I. W. Fuqua, who did not raise the issue.

The plaintiffs proved that prior to the creation of Trust No. 108 a syndicate had been formed for some purpose connected with the Muscoy ranch, that money was paid into an escrow; that title to the ranch was vested in Roof and Jonas, who with their wives conveyed the property to the trustee; that certificates of beneficial interest were issued to the beneficiaries after the creation of Trust No. 108; that Jonas was made the managing agent of the benefi-

ciaries; that J. B. Roof, Inc., acted as selling agent of the properties and sold between two and three hundred parcels; that this selling agent negotiated with plaintiffs for the two sales in question and accepted a considerable sum of money on account of the purchase prices which was never returned; that plaintiffs received nothing for their payments; that Jonas knew of all of the transactions of J. B. Roof, Inc., with the plaintiffs. There is no evidence as to when or how any of the appealing defendants, or any other beneficiaries, acquired their beneficial interests except as to Fuqua. There is evidence that he acquired his interest in 1928, but nothing as to how he acquired it. There is no evidence that any beneficial interest was ever offered for sale to the public.

Every sale of a security or a beneficial interest in a trust is not prohibited unless a permit for such sale is first secured. (*Buttrick* v. *Seines,* 209 Cal. 567 [289 Pac. 616]; *People* v. *Pace,* 73 Cal. App. 548 [238 Pac. 1089]; *In re Lamb,* 61 Cal. App. 321 [215 Pac. 109]; *People* v. *Main,* 75 Cal. App. 471 [242 Pac. 1078]; *Pollak* v. *Staunton,* 210 Cal. 656 [293 Pac. 26].) If the appealing defendants (except Fuqua) were members of the syndicate which furnished the money with which the purchase of the Muscoy ranch was made, their position of owners of beneficial interests under the resulting trust would not be changed by the conveyance of the legal title of the property by Jonas and Roof, the first trustees, to the Metropolitan Trust Company, the succeeding trustee. They would still remain owners of their beneficial interests in the real estate. Assuming these circumstances to be true the certificates issued by the Metropolitan Trust Company to them created no new interest in the trust estate, but were merely evidences of interests created by operation of law when the resulting trust first came into being. Under such circumstances no permit might be necessary for the issuance of certificates if they were not to be sold or offered for sale. If Fuqua acquired his interest in the real estate by conveyance from one who was an owner of a beneficial interest under the resulting trust originally created, his position would be much the same. (*Buttrick* v. *Seines, supra.*)

The evidence of the plaintiffs did not establish that the beneficial interests of defendants in the Muscoy* ranch

were illegally acquired. It therefore became incumbent upon the defendants to establish their defense that they had acquired no beneficial interest in the property or the trust because no permit had been issued by the commissioner of corporations. In 10 California Jurisprudence, page 786, it is said: "Section 1869 of the Code of Civil Procedure provides that 'Each party must prove his own affirmative allegations.' So, not only is it incumbent upon the plaintiff to prove his affirmative allegations, but, as a general rule, the burden is on the defendant to prove new matter alleged as a defense, even though it requires the proof of a negative. 'It makes no difference, therefore, whether the actor is plaintiff or defendant, so far as concerns the burden of proof. If he undertake to make a case, whether affirmative or negative, this case must be made out by him, or judgment must go against him. Hence it may be stated, as a test admitting of universal application, that whether the proposition be affirmative or negative, the party against whom judgment would be given as to a particular issue, supposing no proof offered on either side, has on him, whether he be plaintiff or defendant, the burden of proof, which he must satisfactorily sustain. If there is a case made out against a defendant, on which, if the plaintiff should close, a judgment would be entered against the defendant, then the defendant has on him the burden of proving a case by which the plaintiff's case will be defeated.'" In the absence of any evidence that the beneficial interests of the defendants in the trust estate were illegally acquired we cannot relieve them of their responsibility on this ground.

██ Appellants urge that there is no sufficient proof of the authority of J. B. Roof, Inc., as their agent to permit its actions to bind them. We will here consider this question only in so far as it relates to the recovery of the money paid by plaintiffs, together with interest. This portion of the case does not involve the binding effect of a contract to convey real estate. It only concerns the recovery of money paid by the plaintiffs to J. B. Roof, Inc., for which the plaintiffs received no consideration. The trial court held that these payments were made, and that the money had been converted to the use and benefit of the defendants. This finding is not entirely without evidentiary support.

Appellants cannot question that Jonas was their duly authorized agent with written authority to represent them in the subdivision, improvement and sale of property in the Muscoy ranch. The provisions of the declaration of trust fully justify this conclusion. Jonas knew the following: the transactions between the plaintiffs and J. B. Roof, Inc.; the representations made, the receipts signed, and the payments made by the plaintiffs, both before and after it must have been perfectly apparent that no title to the property could ever be conveyed to the plaintiffs; the retention of the money, or at least that part of it which was not used in the promotion by J. B. Roof, Inc.; that the consideration for plaintiffs' payments failed; that the same general procedure followed in the attempted sale to plaintiffs was followed by J. B. Roof, Inc., in making between two and three hundred sales of property in the Muscoy ranch. Notice to the agent, when within the scope of his authority, is notice to his principals. Under these circumstances the appealing defendants cannot now be permitted to question the authority of J. B. Roof, Inc., to at least receive the payments which were made by the plaintiffs and converted to their use and benefit, and thus escape the responsibility for a return of these payments upon a failure of consideration for them. (In justice to the trustee, Jonas, and probably J. B. Roof, it should be remarked that they tried to levy an assessment on the beneficiaries so that plaintiffs' money could be refunded.)

Appellants next urge that the portion of the judgment for $1125, the reasonable market value of the avocado trees lost to plaintiffs, cannot be sustained under the provisions of section 3306 of the Civil Code, which provides as follows: "The detriment caused by the breach of an agreement to convey an estate in real property, is deemed to be the price paid, and the expenses properly incurred, in examining the title and preparing the necessary papers, with interest thereon; but adding thereto, in case of bad faith, the difference between the price agreed to be paid and the value of the estate agreed to be conveyed, at the time of the breach, and the expenses properly incurred in preparing to enter upon the land." They urge that there is no allegation, evidence or finding of bad faith which will support this element of special damage. As this portion of

the judgment must be reversed, and the complaint will probably be amended, this question need not be further discussed.

Appellants further contend that, assuming bad faith, only ''the expenses properly incurred in preparing to enter upon the land'' can be recovered, and that this is not the equivalent of the reasonable market value of the avocado trees. This contention must be sustained. The evidence and findings were directed solely to the reasonable value of the trees which is not the proper measure of damage in this case.

The judgment in this action was dated May 11, 1932, was filed the same day and entered May 12, 1932. A notice of appeal to the Supreme Court was given by Charles H. Jonas on July 22, 1932. A second notice of appeal to this court was filed August 6, 1932. The attempted appeal to this court is ineffectual. (Sec. 4a, art. VI, Const.; Rule XXXII, Rules for the Supreme Court and District Courts of Appeal.)

The attempted appeal of Charles H. Jonas to this court is dismissed.

That portion of the judgment whereby the plaintiffs are given judgment for $2,272.83, money paid by them, with $528.76 accrued interest, is affirmed.

That portion of the judgment whereby plaintiffs recovered $1125 damages in connection with the loss of the avocado trees is reversed, with directions to the trial court to permit the amendment of the pleadings on this issue if counsel be so advised, and to retry the sole issues of the expense, if any, properly incurred by plaintiffs in preparing to move onto the lands they attempted to purchase, and the bad faith, if any, of appellants, in the attempted sale of the lands to plaintiffs. The parties will pay their own costs on appeal.

Barnard, P. J., and Jennings, J., concurred.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on February 1, 1934.