153 Cal.App.2d 404 (1957)
ENGINEERING SERVICE CORPORATION (a Corporation), Respondent,
v.
LONGRIDGE INVESTMENT COMPANY (a Corporation) et al., Defendants; MELVIN GORDON et al., Appellants.
Civ. No. 22126. 
California Court of Appeals. Second Dist., Div. Two. 
Aug. 22, 1957.
 Frank C. Wood, Jr. and David Mellinkoff for Appellants.
 A. W. Brunton for Respondent.
 ASHBURN, J.
 Defendants Melvin Gordon, Sam Adams, Joseph H. Waxer, Frederick W. Henderson and Wayne Guthrie, appeal from a decree of foreclosure of a mechanic's lien which holds them personally liable for the amount of plaintiff's claim of $16,839.61, principal and interest. [1] Henderson and Guthrie have filed no briefs, thus abandoning their appeals. [fn. 1]
 [2a] The principal argument presented on behalf of appellants is that the court erred in holding them personally liable for an obligation incurred in the name of Henderson or Longridge Investment Company; subsidiary contentions are that they were not liable as joint venturers and that it was error to hold that Longridge was their alter ego. The soundness of these arguments involves a consideration of the entire story of an attempted subdivision of certain mountainous property situated near the intersection of Mulholland Drive and Coldwater Canyon in the Los Angeles area. [3] In reviewing the evidence we necessarily accept as established all inferences favorable to respondent which find substantial support in the evidence. (New v. New, 148 Cal.App.2d 372, 383 [306 P.2d 987].)
 Henderson, who had had previous experience in subdivision work and considered himself an expert therein, selected this land and entered into an escrow for its purchase, making an *408 initial deposit of $5,000. That money was borrowed by him from his lawyer and friend, defendant Gordon. Defendant Sam Adams was the uncle of Gordon's wife and also a client of his. The three men entered into a written joint venture agreement on October 9, 1952, which recited Henderson's arrangement to purchase this land for $40,000 cash and a trust deed note for $209,700; stated that he lacked the cash and the other two parties were to make it available. They agreed to furnish $41,000 to complete the escrow; Henderson agreed to provide $20,000 "for the purpose of obtaining engineering studies" of the property. Adams and Gordon further agreed that they would make an additional $20,000 available for general purposes after Henderson had made the said $20,000 expenditure for engineering. He agreed, upon acquiring title, to convey the land to Westwood Bonded Escrow Company as trustee to hold same "for the purposes of the trust agreement by and between the parties hereto, as expressed therein." Paragraph 5 provides: "It is agreed by and between the parties hereto that the trust hereinabove indicated is being created to keep the legal title to said real property from becoming subject to a cloud because of the death, divorce, or legal disability, of any or all of the parties hereto, which occurrence could affect the ability of the individuals to convey a good and sufficient marketable title to said real property without court proceedings." Any profits were to be devoted to repayment of capital contributed by the respective parties, then to payment of the trust deed note and the remainder to be divided in the proportions of 50 per cent to Henderson and 25 per cent each to Adams and Gordon. Paragraphs 7 and 8 provide for participation and investment by other persons and that they should be listed as beneficiaries of the trust. A bank account was to be established and money drawn upon the signatures of any two parties to the agreement, i.e., Henderson, Adams and Gordon. The document is entitled "Joint Venture," the understanding is therein referred to as a venture and the participants as venturers. That this was in fact a joint venture is conceded by all counsel.
 The contemplated trust agreement was made on November 1, 1952. It named 16 beneficiaries, including Henderson and the three appellants, Gordon, Adams and Waxer. All of the named beneficiaries had invested in the enterprise prior to the execution of the declaration of trust except Henderson, who was to have a 50 per cent interest just as he had under *409 the previous joint venture agreement. [4] This is a dry trust (see 89 C.J.S. 17, p. 730). The trustee handles no funds, takes no part in management of trust affairs and acts only upon joint direction of Henderson, Gordon and Adams. The written declaration of trust acknowledges conveyance to Westwood of the real property without consideration and for purposes of the trust, declares the respective interests of the beneficiaries and imposes upon the trustee this obligation: "To Convey said real property to the Beneficiary, or to such person, firm or corporation as shall have been directed in writing, by Fred W. Henderson, Melvin Gordon, and Sam Adams, acting together, and the Trustee shall not be required to inquire into the propriety of any such direction, nor put to any expense because of such direction." It is expressly declared that the trustee has no duty to collect rentals, pay taxes and assessments, or to pay or attend to payment of interest or principal upon any lien on the property. The term of the trust is declared to be 21 years "unless sooner revoked or terminated." Section 5 says: "This Trust may be amended, revoked or terminated at any time upon the written direction of Fred W. Henderson, Melvin Gordon and Sam Adams, acting together. No amendment, however, shall enlarge the duties or responsibilities of the Trustee nor affect its fees hereunder without its written consent."
 In its general features this declaration is a typical business or Massachusetts trust, but all powers of management reside in the three named representatives of the beneficiaries. It should be noted that none of the investors' money went to the trustee; it was paid into a bank account handled by the three original joint venturers and known as the Henderson-Adams- Gordon account. This reservation of complete management to the representatives of the beneficiaries and to the exclusion of the trustee leaves the participants in the status of partners or joint venturers and deprives them of the advantage of a true trust arrangement. [5] In the leading case of Goldwater v. Oltman, 210 Cal. 408, 418 [292 P. 624, 71 A.L.R. 871], the court says, concerning Massachusetts or business trusts: "By the weight of authority, where the trustees have complete control of the business, the creators of the trust are treated as are the cestuis que trust of an ordinary equitable trust, and are exempt from direct personal liability to the creditors of the business; but if the trustees are subject to the control of the creators of the trust, the latter or their successors are liable as partners." The quoted rule was *410 adopted as the law of this state. Bernesen v. Fish, 135 Cal.App. 588, 602 [28 P.2d 67], after reviewing the authorities, says: "When the instant case is measured by these rules it is evident that the control of the trustee over the property of the trust estate is far too limited and the control over it and the actions of the trustee by the beneficiaries is too complete to permit any doubt of the fact that the trust here in issue cannot be classified as a Massachusetts or Business Trust. It comes within the other classification in which the beneficiaries reserve to themselves such control over the trustee and trust estate that a specie [sic] of partnership is created. It makes no difference that many of these powers of control are to be exercised by and through a 'business manager.' The beneficiaries expressly appointed him their agent for such purpose." [2b] The last two sentences are significant. Henderson, Gordon and Adams were the business managers appointed by the beneficiaries for that purpose; control of the trust by those agents is control by all beneficiaries. An annotation in 156 American Law Reports 22, 42, says: "According to this doctrine, whether an organization in the form of a business trust is a true trust or a partnership depends upon the manner in which the business is to be conducted and upon the repository of the ultimate power of control over the affairs and property of the concern. If, under the trust instrument, the trustees are vested with title to its property and with the exclusive right to manage its business and conduct its affairs, free from the control of the shareholders, the organization is treated as a trust; but if the trustees are subject to the control of the shareholders in these particulars, and the shareholders have the real mastery over the affairs of the concern, the organization is treated as a partnership and the shareholders as partners." See also 12 Corpus Juris Secundum, section 1(4), page 814. The trust instrument at bar created a partnership or joint venture (the differentiation between the two types of association is too narrow to be of importance here). The court found it to be a joint venture. The parties, or at least some of them, seem to have recognized the true nature of the arrangement. The minutes of a meeting of the directors of Longridge (the alter ego) held on July 11, 1953, show that it was attended by Waxer and Guthrie, and that the following occurred: "The chairman requested that the meeting consider a certain Option Agreement made this day by and between Melvin Gordon, Sam Adams and Frederick W. Henderson, as joint venturers *411 for Westwood Bonded Escrow Co., and Longridge Investment Co." When Adams and Gordon decided to file a notice of nonresponsibility on November 23, 1953, they described themselves as "the beneficial owners and representatives of other beneficial owners" of the land.
 The declaration of trust was made on November 1, 1952. Longridge was not incorporated until January 30, 1953. Henderson had entered into an escrow for the purchase of the land in August, 1952. It was closed on October 28, 1952, by recordation of a deed to him. The money for this purpose was paid out of the Henderson-Adams-Gordon bank account, the money of the other joint venturers (beneficiaries named in the declaration of trust), some $35,000 or $36,000. Henderson at once conveyed to the escrow company and the deed was recorded on October 30. He testified that he took title for that purpose. The first work order for engineering services of plaintiff was given to it by Henderson on October 28, the day he acquired title. That he was acting for the joint venture in so doing cannot be gainsaid. [6] Of course, each member of the joint venture is the agent of the others in transaction of its business. (28 Cal.Jur.2d 9, p. 489; Leming v. Oilfields Trucking Co., 44 Cal.2d 343, 350 [282 P.2d 23].)
 In talking with plaintiff's vice-president and manager, Mr. Koenig, preliminary to ordering plaintiff's services, Henderson said "there were a number of other persons," but did not disclose their identities. On November 14 plaintiff addressed a letter to Hillcrest Construction Co., attention Mr. Henderson (he was actively connected with that company and Glen-Aire Development Company), and in it quoted a price for preliminary work. To this Henderson replied on November 17, authorizing the work and saying: "The bills for this work should tentatively be addressed to me personally, and, in the immediate future, I shall advise you as to which corporation will handle this tract." The engineering study was started and an initial bill of $94.62 was sent to Henderson and paid out of the Henderson-Adams-Gordon bank account. The next one was sent in April, 1953, after Longridge had been organized. Previous to that time Henderson had told Mr. Jordan, plaintiff's president, that "he had finally got his corporation set up and ready to go, and he wanted it billed that way" i.e., to Longridge Investment Company. This was done. The bill was for $4,660.38. Longridge had no such money and the matter was taken up in a meeting between *412 Gordon, Henderson and Guthrie; the record is not clear as to whether Adams was present. It was agreed that the bill be "met by the persons then assembled." This was done by payment out of the funds held in the Henderson-Adams-Gordon account, the moneys of the joint venturers, otherwise known as beneficiaries.
 The reason assigned by defendants for incorporation of Longridge was a plan to hold the land for more than six months, then sell it to another, thus reaping a capital gain and a lesser income tax. But that does not seem to have been carried out in practice, for the corporation was at all times held out as a subdivider. Though it never acquired title to the land it made contracts for sale of lots.
 [2c] This corporation was the typical shell which has been held an alter ego for the undisclosed persons behind it. Its formation was planned at a meeting of Gordon, Henderson and Waxer, all members of the joint venture trust; this was done for the benefit of the venture. The corporation made no application for a permit to issue shares of stock and issued none. An aggregate sum of $200 was paid for stock by Waxer, Hirsch, Guthrie and one La Voie; La Voie's interest in the enterprise does not appear. His contribution was $20. The stock was never issued. The corporation never had any additional capital. Its only prospect of funds for carrying on the business consisted of possible loans from Henderson's two corporations, Hillcrest Construction Company and Glen-Aire Development Company, and proceeds of sales of lots. The ability or willingness of those two corporations to finance this venture rests in the realm of conjecture. Certain it is that they did not do so. Longridge did sell a few lots but it had only an option to buy the property, one which it never exercised, and of course was unable to perform its sales contracts. The incorporators were defendants Guthrie, Waxer and Hirsch. [fn. 2] They became the only directors and officers. Waxer was made president and testified that he had no specific duty or activity in that connection. Meetings of the board of directors were few in number. Its affairs were dominated by Henderson. He testified that he was acting as Longridge's agent in dealing with plaintiff, whose officers testified without dispute from any defendant that their dealings were with Henderson throughout, although occasionally some other member of the trust was present. The corporation never paid any *413 franchise tax and forfeited its right to do business on January 3, 1955. It "blew up," as Henderson put it in his testimony. The court found: "That said defendants caused said corporate defendant to incur debts and to appear to engage in business as the subdivider of said land owned by said joint venturers, with knowledge that creditors were extending credit to said corporation and with knowledge that said corporation had no assets and with knowledge that said corporation was entirely dependent on the other individual defendants for money to pay debts being incurred in the name of said Longridge Investment Co." Also: "That the defendant, Longridge Investment Co. and the organizers, directors and officers thereof were the alter-ego and business conduit of the defendants, Frederick W. Henderson, Melvin Gordon and Sam Adams, and said corporation was organized and used by defendants, Frederick W. Henderson, Melvin Gordon and Sam Adams, and their remaining joint venturers, to enable them to pay income taxes on capital gains instead of business income, which gains said defendants expected to receive upon the subdivision and sale of said real property. That the recognition of the separate entitles [sic] of the defendant, Longridge Investment Co. and the individual defendants, Frederick W. Henderson, Melvin Gordon, Sam Adams, Joseph H. Waxer, Wayne Guthrie and William Hirsch, would aid the consummation of a wrong and promote injustice as to creditors." That the conclusion of alter ego is correct under the more recent interpretations of that doctrine will presently appear. But it should be pointed out first that there probably is no need to rely on that rule.
 The original employment of plaintiff was made by Henderson individually. True, his coventurers were his principals, but their identity was undisclosed. He and they both became liable for the services, for he was acting within the scope of his authority. He told plaintiff's representatives to bill him tentatively. This it did in the first two instances. About February, 1953, after Longridge was incorporated, he advised plaintiff to send the bills to it and plaintiff did so thereafter. Its dealings continued to be with Henderson. There were no conversations between plaintiff and anyone representing Longridge about the substitution of the corporation as debtor in the place and stead of Henderson and his coventurers. He was not an officer of Longridge, and even if he had been there was no talk about releasing anyone in exchange for assumption of the contract obligation by *414 Longridge. This state of facts did not work a novation. [7] "To accomplish a novation by the substitution of a new debtor the substitution must be with the consent of the creditor, and the parties must intend that the obligation of the original debtor be released. Without release of the original debtor--there being no other consideration for the agreement--there is no consideration and consequently no contract." (20 Cal.Jur. 5, p. 250.) "In order to complete a novation successfully by the substitution of one debtor for another, the creditor must consent to it. (Carpy v. Dowdell, 131 Cal. 495 [63 P. 778].) [8] The acceptance of payments from the new owner does not amount to a contract to release the original debtor. (Voss v. Levi, 33 Cal.App. 671 [166 P. 359].)" (University of Redlands v. Ford, 56 Cal.App.2d 151, 152 [132 P.2d 238].) [2d] The joint venturers (beneficiaries) being liable from the beginning, they remained so after assumption of the obligation by Longridge. Hence the judgment properly ran against them regardless of the finding of alter ego.
 The cited cases of Hansen v. Burford, 212 Cal. 100, 111, 113 [297 P. 908] and Hayward's v. Nelson, 143 Cal.App.2d 807, 814 [299 P.2d 1013] are not opposed to these views. In the first instance it was found that a joint venture existed (p. 110), and in the second it was deemed unnecessary to pass upon the point (p. 814). Both proceeded upon the assumption of existence of such a venture, with the fact of its existence and the identity of its members unknown to the creditors; also, a reliance by the creditor upon the responsibility of the member who incurred the debt and an excess of authority on his part in making the contract. In such circumstances it was held that the undisclosed venturers were not liable upon the contract. The Hansen case quotes from 33 Corpus Juris 872, as follows: " 'One who is a member of a joint adventure but who is not known to be such at the time by a third person who enters into a contract with another member individually is not rendered liable to such third person for services rendered under such contract, or for damages for the breach thereof, by the fact that the contract relates to the business of the joint adventure, if the contracting member in making such contract exceeded his authority and had no power to bind his associates thereby.' " (P. 111.) To this the later work adds the important qualification: "[B]ut as a general rule a member of a joint adventure can bind his undisclosed associates by such contracts as are reasonably *415 necessary to carry on the venture." (48 C.J.S. 14, p. 868.) All this is under the caption "Liability of undisclosed member." [9] The basic rule is stated in Campagna v. Market St. Ry. Co., 24 Cal.2d 304, 308 [149 P.2d 281]: "The relationship of joint venturers is that of a mutual agency, akin to a limited partnership." In the case at bar there was no excess of authority on the part of Henderson, with whom plaintiff contracted. While the initial joint venture between Henderson, Adams and Gordon specifies that Henderson agrees to provide $20,000 for the purpose of obtaining engineering studies, it also says in paragraph 7: "It is further agreed by and between the parties hereto and understood by them that funds other than their own may be employed to meet any cash required of the parties hereto, but that no person whose funds may be used will have any greater rights that the party hereto who employs such funds may have under the terms hereof." This is a clear reference to the Westwood Trust and the persons who might become beneficiaries through subscription thereto. It thus appears that moneys of the beneficiaries could be used in the place of that pledged by the original venturers, and that Henderson was not obligated personally to pay initially for the engineering after the trust was financed. It has been shown above that he took title to the property for the purpose of conveying it to the trustee and that this was done immediately; also that Henderson, Gordon and Adams were constituted managers of the trust and of the joint venture which we hold to have been created thereby. [2e] The affairs of that venture actually were managed by Henderson and Gordon, and Henderson's prompt ordering of plaintiff's engineering services was in furtherance of the existing plan. He had implied and actual authority to contract for that work and when he did so he obligated all of his coventurers, though the fact of their existence and their identities were not disclosed.
 [10] Application of the alter ego doctrine does not depend upon pleading or proof of fraud. "It is not necessary that the plaintiff prove actual fraud. It is enough if the recognition of the two entities as separate would result in an injustice." (Gordon v. Aztec Brewing Co., 33 Cal.2d 514, 523 [203 P.2d 522].) [11] When it is found, as here, that the corporation is but a shell, with no capital, no substantial assets, no issued stock, no permit to issue stock, and that it is conducting the affairs of the defendants (or a partnership or joint venture of which they are members) there is present *416 sound basis for disregarding the corporate entity and fastening the debt upon the real parties in interest. [12] It is the inequitable result of refusing to pierce the corporate veil which controls the decision. Automotriz etc. De California v. Resnick, 47 Cal.2d 792, 796 [306 P.2d 1]: "It has been stated that the two requirements for application of this doctrine are (1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow. ..."
 "The failure to issue stock or to apply at any time for a permit, although not conclusive evidence, is an indication that defendants were doing business as individuals. ... In the Marr case [fn. 3] the court stated: 'While the fact standing alone that a corporation remains inchoate without stockholders or stock is not of itself determinative of an alter ego relationship upon its part, nevertheless it does indicate that such corporation may exist merely to serve the interests of another--a corporation or an individual.' (40 Cal.App.2d at p. 682.)"
 "Another factor to be considered in determining whether individuals dealing through a corporation should be held personally responsible for the corporate obligations is whether there was an attempt to provide adequate capitalization for the corporation. In Ballantine on Corporations (rev. ed., 1946), at pages 302-303, it is stated: 'If a corporation is organized and carries on business without substantial capital in such a way that the corporation is likely to have no sufficient assets available to meet its debts, it is inequitable that shareholders should set up such a flimsy organization to escape personal liability. The attempt to do corporate business without providing any sufficient basis of financial responsibility to creditors is an abuse of the separate entity and will be ineffectual to exempt the shareholders from corporate debts. It is coming to be recognized as the policy of the law that shareholders should in good faith put at the risk of the business unincumbered capital reasonably adequate for its prospective liabilities. If the capital is illusory or trifling compared with the business to be done and the risks of loss, this is a ground for denying the separate entity privilege.' "
 Appellants argue that this line of cases is inapplicable because *417 plaintiff made no inquiry and was given no assurances concerning Longridge or its capital or assets, but dealt with it and it alone as the one responsible for payment for plaintiff's services. Laying aside for the moment the fact that plaintiff did not release Henderson or his principals, the contention cannot be sustained. [13] One who deals with a corporation as such may sometimes be precluded from later denying its corporate status, but the matter is essentially one of estoppel (see Hiehle v. Torrance Millworks, Inc., 126 Cal.App.2d 624, 629 [272 P.2d 780]), and we have no element of reliance by defendants upon any conduct of plaintiff which could give rise to that equitable conclusion. The judgment places the burden upon those who should bear it in equity and good conscience.
 Appellants inveigh against the judge's conduct of the trial. It is true that he took a lively interest in the progress of the hearing, had a keen appreciation and clear memory of the evidence and was reluctant to hear the same things repeatedly. [14] Cognizant of the fact that the trial judge is not a mere referee of a bout between counsel, but is charged with the duty of eliciting all pertinent facts without undue waste of time and to that end to interfere with counsel whose methods are designedly or unintentionally dilatory (see Hoel v. City of Los Angeles, 136 Cal.App.2d 295, 307 [288 P.2d 989]), the judge incurred the bitter displeasure of defense counsel. Appellants' attorney makes 24 assignments of alleged improprieties in the conduct of the judge (some with several subdivisions) and 16 specifications of error in rulings on evidence. All have been examined with the result that we have concluded that only a few of the specifications are well-grounded and that they did not effect a miscarriage of justice. In People v. Watson, 46 Cal.2d 818, 836 [299 P.2d 243], the court says: "That a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." [15] It is neither incumbent upon the court to discuss all of the alleged errors, nor would it be conducive to clarification of existing legal principles.
 Henderson's chief defense was that plaintiff's engineering services were so badly performed that the work would involve an excavation of a million yards of dirt in excess of the *418 amount which would "balance" the necessary cuts. The other defendants also embraced this claim. It was denied by plaintiff's witnesses and the court rejected Henderson's testimony. There is no assertion that the evidence is insufficient to sustain the finding of the value of plaintiff's services in the amount for which judgment was rendered.
 Appellants' counsel complain of rulings made upon examinations conducted by Mr. Wood and Mr. Gammon, who represented Henderson and Longridge but did not appear for any of these appellants. An examination of the record discloses, however, that such errors as occurred therein did not work a miscarriage of justice. The court did not abuse its power of holding within reasonable bounds the examination of witnesses who had been questioned under section 2055, Code of Civil Procedure. (Code Civ. Proc., 2044; 27 Cal.Jur., 76, p. 97.)
 [16] Complaint is made that evidence was excluded which bore directly upon the motives, good faith and plans of those who formed Longridge and conducted its affairs. Superficially there seems to be some merit in this argument, for the complaint charged intent to defraud creditors through the corporate device. But plaintiff's evidence did not substantially support the claim of fraudulent intent. It established a setup which would result in an inequitable result if the corporate entity were not disregarded, and hence a proper case for application for the doctrine of alter ego. The court found affirmatively upon that issue but did not find that there was any fraud or fraudulent intent on the part of defendants. A clear and affirmative showing that defendants entertained no fraudulent intent could not have changed the result and exclusion of the proffered evidence could not work a miscarriage of justice. Moreover, the court did not rule out all evidence on this subject of bona fides. The substance of what defendant Henderson was trying to show is in the record. The court rejected his testimony in its major aspects and it is not probable that the result would have been any different if he had been allowed to testify to his mental processes and the purity of his motives.
 It is said that the judge exhibited hostility toward defendants Waxer and Gordon such as to show it was impossible for him to give them a fair trial. The record does not justify the claim. Plaintiff had to make its case against defendants other than Henderson and Longridge through examinations under section 2055, Code of Civil Procedure. Defendants were *419 reluctant witnesses and for the most part were not only uncooperative but also evasive. Plaintiff's case extended into the fifth day and comprises 451 pages of a 546-page transcript. When plaintiff rested the joint ventures and the need for piercing the corporate veil had been proved by indisputable documentary and other evidence, most of which had been reluctantly divulged by defendants. Henderson's attorneys opened their case with an attempt to develop a detailed recanvassing of the subjects which had been covered under section 2055 examinations. Counsel began by inquiring into Henderson's connection with Hillcrest Construction Company and Glen-Aire Development Company and whether he was a stockholder therein,-- all of which things were immaterial. So the judge asserted his prerogative of guiding the trial: "The Court: Isn't that testimony before the Court? Mr. Gammon: Not exactly that way, I believe. The Court: I so understood it. Mr. Gammon: He mentioned he was connected with those corporations. The Court: He became the general sales manager of this company. This case is dragging and lagging, counsel, and if counsel will take the necessary steps to hasten it along a little, the Court would appreciate it. It can be done with little effort. Mr. Gammon: We will do our best. Q. By Mr. Gammon: Now, were you also a stockholder in those corporations? A. No, sir, I was not. The Court: Counsel, we have all that testimony by this witness in the record." Appellants say this was "an unseemly speedup, characterized by constant harassment of defense counsel and witnesses, eliminating any possibility of a methodical and lawyer-like presentation of evidence." On the contrary, there was no impropriety in the court's remarks. [17] The trial of a lawsuit presents to the judge an ever-present problem of balancing the right to a full hearing with the need for expedition in the transaction of business. The determination of where to draw the line presents a problem which is peculiarly that of the trial judge, a matter of judicial discretion and its exercise must be respected as such unless a clear case of abuse be shown.
 Hostility to defendant Waxer is said to be reflected in the following remark of the judge: "The witness is not assisting, and, I think, is rather reticent to answer the questions, and it is in the form of cross-examination under 2055, and you may answer the question." The transcript shows that this was a mild description of the attitude of the witness who had been evasive to an extent calculated to exasperate *420 any fair-minded person who was in quest of the truth and desirous of developing it within a reasonable period of time.
 When defendant Guthrie, the secretary-treasurer of Longridge, was on the stand he repeatedly asserted lack of memory of corporate affairs, especially recorded matters. [fn. 4] Finally there was the following colloquy: "Q. As I recall, you indicated that you might be able to refresh your recollection by looking at these deposit tickets. The Court: He couldn't under 2055, how could he now, counsel? Mr. Gordon: I believe he did under 2055, your Honor. The Court: He said he didn't know in which bank he made the deposits. Mr. Brunton: That is my memory. Mr. Gordon: As I recall, this is going back to Friday's testimony__________ The Court: I am speaking of his testimony this morning when that exhibit was presented to this witness and this witness testified that he did not recall who made it--what bank the checks were drawn on and who made them. Mr. Gordon: I believe during the recess, your Honor, his memory may have been refreshed. The Court: Conveniently or otherwise? Mr. Gordon: No, sir, not conveniently, but as a matter of assisting the witness to recall the particular situation so the testimony might be sensible. The Court: Proceed. Proceed." Counsel say that thereby "Counsel-defendant Gordon was charged from the bench with violation of his attorney's oath, if not the commission of crime; the witness-defendant involved was slandered." It does not appear that Mr. Gordon was the one who had refreshed the witness' memory or, if so, that he had done anything improper in the process, nor did the judge assert either of these things. So far as slander of the witness is concerned, his previous performance on the stand afforded ample basis for the remark. There was no prejudicial error here. (See Irer v. Gawn, 99 Cal.App. 17, 25-26 [277 P. 1053]; Ward v. Read, 219 Cal. 65, 71 [25 P.2d 821]; Smith v. Coleman, 46 Cal.App.2d 507, 513 [116 P.2d 133].)
 [18] There was no error in refusing to hear argument upon defendants' motion for nonsuit. The motion clearly could not succeed and argument would have been but a waste of time. (2 Witkin, California, Procedure, 49, p. 1777; Motor Service Express v. Cowan, 120 Cal.App. 284, 286 [7 P.2d 763]; Larson v. Blue & White Cab Co., 24 Cal.App.2d 576, 578 [75 P.2d 612].)
 [19] Nor is it error for the court to strike on its own *421 motion improper evidence, though it may have been received without objection. (24 Cal.Jur. 57, p. 775; Trancoso v. Trancoso, 96 Cal.App.2d 797, 798 [216 P.2d 172]; Holloway v. McNear, 81 Cal. 154, 157 [22 P. 514].)
 [20] Appellants assert that there is an absence of indispensable parties, in that some of the joint adventures were not brought in as defendants. It is said that a contract made on behalf of joint venturers creates joint liability and hence all members of the venture must be joined as parties. Generally speaking, this is the rule as to partnerships (modified somewhat by Corp. Code, 15015), but the failure to join all members as parties is a defect which is waived by failure to raise it promptly, as on demurrer. (Baker & Hamilton v. Lambert, 5 Cal.App. 708, 709 [91 P. 340]; Berringer v. Krueger, 69 Cal.App. 711, 713 [232 P. 467]; Lucy v. Lucy, 22 Cal.App.2d 629, 632 [71 P.2d 949].) This rule necessarily implies that the absent joint obligors are not indispensable parties. (See Bank of Calif. v. Superior Court, 16 Cal.2d 516, 522 [106 P.2d 879]; 20 Cal.Jur. 57, p. 578.) The same rules are applicable to a suit against joint venturers. (28 Cal.Jur.2d, 9, p. 489; 48 C.J.S., 16, p. 874.)
 Other contentions of counsel do not require discussion.
 Judgment affirmed.
 Moore, P. J., and Fox, J., concurred.
NOTES
[fn. 1] 1. Except as otherwise indicated, the term "appellants" will refer to Gordon, Adams and Waxer. Plaintiff will be referred to as Engineering, and defendant corporation as Longridge.
[fn. 2] 2. Hirsch is one of the defendants against whom the judgment runs, but he defaulted below and has not appealed.
[fn. 3] 3. Marr v. Postal Union Life Ins. Co., 40 Cal.App.2d 673 [105 P.2d 649].
[fn. 4] 4. It seems that there were no formal books or records and such as the corporation had were stolen.